**WOMEN'S MEDICAL PROFESSIONAL CORP. and Martin Haskell, M.D., Plaintiffs,**

**v.**

**George VOINOVICH, Governor, State of Ohio and Betty Montgomery, Attorney General, State of Ohio and Matthias Heck, Jr., Prosecuting Attorney, Montgomery County, Ohio, Defendants.**

No. C–3–95–414.

United States District Court,
S.D. Ohio,
Western Division.

Dec. 13, 1995.

David Carr Greer, Bieser, Greer & Landis, Dayton, OH, Alphonse Adam Gerhardstein, Cincinnati, OH, Sarah Poston, Cincinnati, OH, Kathryn Kolbert, Janet Crepps, The Center for Reproductive Law and Policy, New York City, for plaintiffs.

Kent M. Shimeall, Ohio Attorney General, Columbus, OH, Marilena R. Walters, Michael John Renner, Diane R. Richards, Ohio Attorney General, Columbus, OH, for George NMI Voinovich, Betty Montgomery.

Chris Van Schaik, Montgomery County Prosecutor's, Dayton, OH, Elissa Dale Cohen, Montgomery County Prosecutor, Dayton, OH, for Mathias H. Heck, Jr.

DECISION AND ENTRY GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION (DOC. # 2); DEFENDANTS, EMPLOYEES, AGENTS, SERVANTS PRELIMINARILY ENJOINED FROM ENFORCING ANY PROVISION OF HOUSE BILL 135, PENDING A FINAL DECISION ON THE MERITS; CONFERENCE CALL SET TO DETERMINE FURTHER PROCEDURES TO BE FOLLOWED IN THIS LITIGATION

RICE, District Judge.

Never, since the final shot of the Civil War, over a century and a quarter ago, has American society been faced with an issue so polarizing and, at the same time, so totally incapable of either rational discussion or compromise, as is the ongoing controversy, of which this case is but the latest chapter, over the legality of attempts by the State to regulate abortion—the act of voluntarily terminating a pregnancy, prior to full term.[1]

Over the course of six days of hearings, this Court has heard testimony from a number of medical practitioners, each expert in the field in which he or she testified. This Court believes that, regardless of the personal opinions of these professionals, whether pro-choice or pro-life, each testified, not in accordance with those personal opinions, but rather on the basis of his or her medical opinion. So, too, has this Court endeavored to put aside its personal opinion on the issues herein, in order to render an opinion which it

---

1. According to the Supreme Court's opinion in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), until the last half of the nineteenth century, most states used the English common-law approach to abortion, which only criminalized abortion after the fetus "quickened," or moved *in utero*, which typically occurred during the sixteenth to eighteenth weeks of pregnancy. *Id.* at 132, 138, 93 S.Ct. at 716, 719. In the latter half of the nineteenth century, a number of states enacted statutes which criminalized abortion, at any stage of pregnancy. *Id.* at 139, 93 S.Ct. at 720. By the end of the 1950s, most states banned all abortions except those necessary to preserve the life or health of the mother. *Id.*

In *Roe*, the Supreme Court held that a pregnant woman has a constitutional right to privacy, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which prevents states from proscribing abortion before viability. 410 U.S. at 147–65, 93 S.Ct. at 724–33. *Roe* also established a trimester framework: during the first trimester, the State could not interfere with the woman's decision to have an abortion; during the second trimester and until viability, the State could regulate abortion in ways that were reasonably related to the mother's health; after viability, the State could proscribe abortion, except where necessary to preserve the life or health of the mother. *Id.* at 163–65, 93 S.Ct. at 732–33.

In *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court reaffirmed *Roe*'s "central holding" that, prior to viability, the State could not prohibit any woman from obtaining an abortion, because of the woman's liberty interest as protected by the Fourteenth Amendment to the United States Constitution. In contrast to *Roe*, however, the Court placed a greater emphasis on the State's interest in potential life throughout pregnancy. Accordingly, the Court discarded the trimester framework in *Roe*, and allowed the State to regulate pre-viability abortions as long as the regulation did not impose an "undue burden": that is, as long as the regulation had neither "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S.Ct. at 2820–21.

In the few years since *Casey* was decided, several states have enacted regulations on pre-viability abortions, and the constitutionality of some of these regulations has been challenged. *See, e.g., Planned Parenthood v. Miller*, 63 F.3d 1452 (8th Cir.1995) (striking down parental notification provisions, criminal provisions, and civil penalty provisions; upholding mandatory information requirements); *Jane L. v. Bangerter*, 61 F.3d 1493 (10th Cir.1995) (striking down ban on abortions after 20 weeks, fetal experimentation ban, and choice of method requirement; upholding medical emergency exception); *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526 (8th Cir.1994) (upholding mandatory information requirement, 24–hour waiting period, and medical emergency definition); *Barnes v. Mississippi*, 992 F.2d 1335 (5th Cir.) (upholding parental consent requirement and judicial bypass mechanism), *cert. denied,* —— U.S. ——, 114 S.Ct. 468, 126 L.Ed.2d 419 (1993); *Barnes v. Moore*, 970 F.2d 12 (5th Cir.) (upholding informational requirement and 24–hour waiting period), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992); *Utah Women's Clinic, Inc. v. Leavitt*, 844 F.Supp. 1482 (D.Utah 1994) (upholding 24–hour waiting period and medical emergency exception); *Planned Parenthood v. Neely*, 804 F.Supp. 1210 (D.Ariz.1992) (striking down medical emer-

believes is mandated by the present state of the law.

This case presents a challenge to the constitutionality of House Bill 135, which was enacted by the Ohio General Assembly on August 16, 1995, and was to have become effective on November 14, 1995. After hearing two days of testimony, this Court granted a ten-day Temporary Restraining Order on November 13, 1995, which was extended for an additional ten days, and was set to expire today, on December 13, 1995. Following four additional days of testimony, the Court now issues a preliminary injunction which enjoins enforcement of the three major portions of the Act: the ban on the use of the Dilation and Extraction ("D & X") abortion procedure; the ban on the performance of post-viability abortions, and the viability testing requirement. During the effective period of this preliminary injunction, no part of House Bill 135 may be enforced, as there is no part which appears to be either constitutional, or severable, from the remainder of the Act.

This Act creates two separate bans, and a separate requirement with regard to post-viability abortions. *First,* the Act bans the use of the Dilation and Extraction ("D & X")

procedure [2] in all abortions, including those performed before viability. O.R.C. § 2919.15(B). Physicians who are criminally prosecuted or sued civilly for violating this ban may assert, as an affirmative defense, that all other available abortion procedures would pose a greater risk to the health of the pregnant woman. § 2919.15(C); § 2307.51(C). *Second,* the Act bans all post-viability abortions, except where necessary to prevent the pregnant woman's death, or to avoid a serious risk of substantial and irreversible impairment to a major bodily function.[3] § 2919.17(A). For purposes of the post-viability ban only, any unborn child of at least 24 weeks is presumed to be viable.[4] § 2919.17(C). *Third,* the Act also imposes a viability testing requirement before an abortion may be performed after the 22nd week of pregnancy. § 2919.18. Unless a medical emergency exists, any physician intending to perform a post-viability abortion must meet several requirements.[5] The Act creates civil and criminal liability for violations of the D & X ban or the post-viability ban, and criminal liability for violations of the viability testing requirement.[6]

Plaintiff Women's Medical Professional Corporation ("WMPC") operates clinics and

---

gency definition, and definition of medical procedures with respect to an abortion).

**2.** *The D & X procedure is defined as:*

The termination of a human pregnancy by purposely inserting a suction device into the skull of a fetus to remove the brain. "Dilation and extraction procedure" does not include either the suction curettage procedure of abortion or the suction aspiration procedure of abortion. O.R.C. § 2919.15(A).

**3.** The determination that a post-viability abortion is necessary must be made in good faith, and in the exercise of reasonable medical judgment. O.R.C. § 2919.17(A).

**4.** The gestational age is calculated from the first day of the last menstrual period of the pregnant woman. § 2919.16(B).

**5.** The following requirements apply to post-viability abortions: (1) the physician must certify the necessity of the abortion in writing, (2) a second physician must certify the necessity of the abortion in writing, after reviewing the patient's medical records and tests, (3) the abortion must be performed in a health care facility which has

access to neonatal services for premature infants, (4) the physician must choose the abortion method which provides the best opportunity for the fetus to survive, unless it would pose a significantly greater risk of death to the pregnant woman, or a serious risk of substantial and irreversible impairment to a major bodily function, and (5) a second physician must be present at the abortion to care for the unborn human. O.R.C. § 2919.17(B)(1). These conditions need not be complied with if the physician determines, in good faith and in the exercise of reasonable medical judgment, that a medical emergency exists and prevents compliance. § 2919.17(B)(2).

**6.** Violation of the viability testing requirement is a fourth degree misdemeanor. O.R.C. § 2919.18(B). Violation of either the D & X ban or the post-viability ban is a fourth degree felony. § 2919.15(D), § 2919.17(D). A patient upon whom one of these procedures is performed or attempted to be performed is not criminally liable. § 2919.15(E), § 2919.17(D). She may, however, sue within one year of the procedure or attempted procedure for compensatory punitive, and exemplary damages, as well as for costs and attorneys fees. § 2307.51(B), § 2307.52(B). Derivative claims for relief may also be brought. § 2305.11(D)(3) & (7).

provides abortion services in Montgomery, Hamilton, and Summit Counties (Doc. # 1, ¶ 5). Plaintiff Haskell, a doctor affiliated with Plaintiff WMPC, formerly performed abortions after the 24th week, but no longer does so; he uses the D & X procedure for abortions during the 21st to 24th week of gestation (*Id.,* ¶ 6). On October 27, 1995, Plaintiffs filed this suit for declaratory and injunctive relief from all provisions of the Act, on their own behalf and on behalf of their patients. Plaintiffs allege that this Act imposes an undue burden on the rights of their patients to choose an abortion, and, further, that the Act's provisions are unconstitutionally vague and fail to give physicians fair warning as to what actions will incur criminal and civil liability. Accordingly, they seek to enjoin the Act as a violation of Plaintiffs' rights to privacy, liberty, and due process, as guaranteed by the Fourteenth Amendment to the United States Constitution.

*I. Jurisdiction, Ripeness, Standing, Preliminary Injunction Standard*

Before addressing the merits of Plaintiffs' request for a preliminary injunction, this Court must address three issues relating to its jurisdiction over this action. *First,* because this case involves a challenge to the constitutionality of a state statute under the United States Constitution, federal question jurisdiction is proper under 28 U.S.C. § 1331. *Second,* even though Plaintiff Haskell has not yet been prosecuted for violating the Act, this case is ripe for decision because a doctor facing criminal penalties for performing abortions may sue for pre-enforcement review of the relevant statute. *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745–46, 35 L.Ed.2d 201 (1973).

*Third,* Plaintiff Haskell has the necessary standing to raise both his own rights and the rights of his patients. Because Plaintiff Haskell has asserted that he intends to continue performing the D & X procedure after this law takes effect, he is at direct risk of prosecution, and has standing to seek pre-

enforcement review of this statute. *Doe,* 410 U.S. at 188, 93 S.Ct. at 745–46. Given the close relationship between Plaintiff Haskell and his patients, and given the obstacles which prevent pregnant women from challenging this statute, including a desire for privacy and the imminent mootness of their claims, he may also assert third-party standing and raise the rights of his patients. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (plurality opinion) (allowing two doctors to sue for declaratory and injunctive relief from state statute taking away Medicaid funding for abortions), *cited with approval in Planned Parenthood Ass'n v. Cincinnati,* 822 F.2d 1390, 1396 (6th Cir. 1987). It is also noteworthy that in *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), an action for declaratory and injunctive relief from a state statute restricting the right to abortion was brought by similar plaintiffs: abortion clinics and a doctor. Based on the foregoing authority, Plaintiff Haskell has standing to bring this action, and to assert both his own rights and the rights of his patients. Although Defendants have argued that the Plaintiff must show that a particular woman will be impacted by the Act in order to have standing to raise her rights, this Court agrees with Plaintiff Haskell's argument that such a showing is unnecessary. It is sufficient that Plaintiff Haskell has alleged that he regularly has patients upon whom he performs the procedure, and that he will have such in the future.[7]

Plaintiff Haskell also has standing to challenge the provisions of the Act which ban post-viability abortions, codified at O.R.C. § 2919.17, and the viability testing requirement in O.R.C. § 2919.18. Defendants have argued that he lacks standing to challenge these provisions, because he only performs the D & X procedure up through the 24th week of pregnancy (Defendant's Memorandum in Opposition, Doc. # 11, p. 27, 34). The ban on post-viability abortions, however, imposes a rebuttable presumption of viability at 24 weeks, O.R.C. § 2919.17(C), which will

---

**7.** In addition, this Court notes that one such patient, Jane Doe Number 2, testified in this hearing after her abortion was performed by Dr. Haskell on November 30, 1995—two weeks *after* the Act was to have taken effect.

apply to Plaintiff Haskell. If, in certain cases, he is unable to rebut the presumption of viability, the remaining provisions relating to the ban on post-viability abortions will also apply to him. In addition, Plaintiff Haskell will have to satisfy the viability testing requirement for any patients he treats who are in or beyond their twenty-second week of pregnancy. Therefore, Plaintiff Haskell also has standing to challenge these provisions of House Bill 135.

Plaintiff WMPC sues on behalf of its physicians who are employed at its various affiliated locations, and on behalf of women who receive medical services, including abortions, at these locations. This Court does not now reach the issue of whether Plaintiff WMPC has standing to bring this action, due to an inadequately developed factual record.[8] This issue need not be reached at this time, because Plaintiff's Haskell's standing is sufficient to allow this action to go forward. Accordingly, the remainder of this opinion will use "Plaintiff" in the singular, in reference to Plaintiff Haskell. This Court now turns to the merits of Plaintiff's Motion for a Preliminary Injunction.

When considering whether a preliminary injunction is proper, this Court must consider four factors: (1) the substantial likelihood of the Plaintiff's success on the merits; (2) whether the injunction will save the Plaintiff's patients from irreparable injury; (3) whether the injunction would harm others;[9] and (4) whether the public interest would be served by issuance of the injunction. *International Longshoremen's Ass'n v. Norfolk Southern Corp.*, 927 F.2d 900, 903 (6th Cir. 1991), *cert. denied*, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 38 (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir.1985)). This Court need not conclude that all four factors support its decision. *Chrysler Corp. v. Franklin Mint Corp.*, 1994 WL 378144, at * 2, 1994 U.S.App. LEXIS 18389, at *4 (6th Cir.1994). Rather than being "rigid and un-

bending requirements" that must be satisfied, these factors are intended to guide this Court's discretion in balancing the equities. *In re Eagle–Picher Industries, Inc.*, 963 F.2d 855, 859 (6th Cir.1992). For example, the degree of likelihood of success which is required to issue a preliminary injunction may vary according to the strength of the other factors. *In re DeLorean Motor Co.*, 755 F.2d at 1229. This Court must make specific findings as to each of these factors, unless fewer are dispositive of the issue. *International Longshoremen's Ass'n*, 927 F.2d at 903.

## II. Plaintiff's Substantial Likelihood of Success on the Merits

Plaintiff has asserted a number of arguments attacking the constitutionality of the D & X ban, the post-viability ban, and the viability testing requirement. Many of these arguments can be divided into two categories: first, those that assert that the Act either imposes an undue burden on a woman's right to an abortion, or jeopardizes the pregnant woman's health, and is thus unconstitutional under *Casey*; second, those that assert that the Act is unconstitutionally vague. Before addressing these arguments, this Court will briefly set forth the relevant law to be applied to each of these categories. This Court will then consider each of the three challenged statutory provisions in turn.

### A. Standards for Challenging Abortion Regulations

#### 1. The Substantive Law

In *Planned Parenthood v. Casey*, a plurality of the Supreme Court held that viability marks the point at which the State's interest in protecting the potential life of the fetus outweighs the pregnant woman's liberty interest in having an abortion, subject only to a medical determination that her own life or health is at risk. 505 U.S. at 868–70, 874–77, 112 S.Ct. at 2816–17, 2819–2821. Before viability, states may not enact regulations

---

8. For example, although Plaintiff WMPC has asserted that it has standing because it will incur civil liability under the Act, this Court does not now have facts sufficient to conclude that Plaintiff WMPC may be civilly liable.

9. This third prong is also construed as a "balancing of equities"; to wit, whether the harm which would be suffered by the Plaintiff if the injunction were not granted, outweighs the harm which would be suffered by the Defendant if the injunction were to be granted.

which have "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion...." 505 U.S. at 877, 112 S.Ct. at 2820. Such regulations constitute an "undue burden" on a pregnant woman's right to have an abortion, and are an unconstitutional violation of her liberty interest, as guaranteed by the Fourteenth Amendment to the United States Constitution. *Id.* at 874–75, 112 S.Ct. at 2819. After viability, however, the State may regulate and proscribe abortions "except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 879, 112 S.Ct. at 2821. Therefore, whereas regulations which affect pre-viability abortions are subject to an undue burden analysis, regulations which apply only to post-viability abortions are presumptively valid, unless they have an adverse impact on the life or health of the pregnant woman.

It has been suggested that "strict scrutiny" should be applied to the medical necessity exception to the ban on post-viability abortions, codified at O.R.C. § 2919.17(A)(1).[10] In the opinion of this Court, a strict scrutiny approach would be improper in this specific situation, because it might allow a state, in some circumstances, to proscribe a post-viability abortion *even where* such an abortion is necessary to preserve the life or health of the mother. For example, in a situation where the mother is terminally ill, and is only expected to live for a maximum of six months following the post-viability abortion that saves her life, a state might attempt to argue that its interest in the fetus's life was actually *more* compelling than the mother's compelling interest in her own life, and that this

interest should allow it to forbid an abortion in that circumstance.

This would force courts to decide when, and under what circumstances, an unborn child's life becomes more important, and more worthy of protection, than the life of its mother. In the opinion of this Court, this inquiry is beyond the realm of legal jurisprudence, and must be left to the discretion of the individuals involved. Neither the legislature, nor the courts, has either the legal or the moral authority to balance the interests and the lives involved, and to make this decision.

 Therefore, this Court holds that although a state may ban most abortions subsequent to viability, it may not take away a pregnant woman's right, as recognized in *Casey*, to have a post-viability abortion which is necessary to preserve her life or health. A strict scrutiny analysis could have the effect of narrowing this exception, and should not be applied. Instead, any regulation which impinges upon or narrows this exception, must be declared to be unconstitutional.

### 2. Standard for Reviewing Facial Challenges to Abortion Regulations

There is some dispute as to the proper showing which Plaintiff must make in order to succeed in bringing this facial challenge.[11] Before the Supreme Court's decision in *Casey*, a plaintiff bringing a facial challenge to a statute imposing restrictions on abortion faced the difficult burden of establishing "that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), *fol-*

---

**10.** Quite obviously, such a level of scrutiny cannot be applied to the ban itself, for *Casey* instructs us that a state may ban abortions after viability, unless an abortion is necessary, in the appropriate medical judgment, to preserve the life or health of the mother.

**11.** The difference between challenging a statute "on its face," as in this case, or in challenging it "as applied," was recently explained by Justice Scalia:

Statutes are ordinarily challenged ... "as applied"—that is, the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes

to act, would be unconstitutional. The practical effect of holding a statute unconstitutional "as applied" is to prevent its future application in a similar context, but *not* to render it utterly inoperative. To achieve the latter result, the plaintiff must succeed in challenging the statute "on its face."

*Ada v. Guam Society of Obstetricians & Gynecologists,* 506 U.S. 1011, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting from denial of *cert.*). In the instant case, Plaintiff Haskell seeks to have the entirety of House Bill 135 declared unconstitutional, and not only as it applies to his particular situation. Thus, he is bringing a facial challenge to the statute.

*lowed by Rust v. Sullivan,* 500 U.S. 173, 183, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991) (applying *Salerno* to facial challenge to regulations prohibiting facilities which receive federal funds from counseling, referring, or advocating abortion as a method of family planning); *Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 514, 110 S.Ct. 2972, 2980–81, 111 L.Ed.2d 405 (1990) (applying *Salerno* to facial challenge to judicial bypass procedure for minors seeking abortions); *cited in Webster v. Reproductive Health Services,* 492 U.S. 490, 524, 109 S.Ct. 3040, 3060, 106 L.Ed.2d 410 (1989) (O'Connor, J., concurring) (applying *Salerno* to facial challenge to state law prohibiting use of public facilities to perform abortions except where necessary to save the mother's life). In *Casey,* however, the plurality employed a more relaxed standard in striking down the Pennsylvania spousal notification provision: the law was held to be invalid because "in a large fraction of the cases in which [it] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." 505 U.S. at 895, 112 S.Ct. at 2830. Moreover, when examining the informed consent provision, the plurality specifically examined the record, and the facts contained therein, which related to the application of the challenged provision to specific persons and in specific circumstances. *Id.* at 885–98, 112 S.Ct. at 2825–31. This appeared to signal a new approach to evaluating facial challenges to pre-viability abortion regulations.

Since *Casey,* a split has developed among the Circuits as to whether the *Casey* approach has replaced the *Salerno* standard. The Third and Eighth Circuits, joined by district courts in the Seventh (Indiana) and Tenth Circuits (Utah), have concluded that *Casey* did replace *Salerno. Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1458 (8th Cir.1995) ("we choose to follow what the Supreme Court actually did ... and apply the undue burden test"); *Casey v. Planned Parenthood,* 14 F.3d 848, 863 n. 21 (3rd Cir.1994) ("the Court has ... set a new standard for facial challenges to pre-viability abortion laws"); *A Woman's Choice–East Side Women's Clinic v. Newman,* 904 F.Supp. 1434, 1448 (S.D.Ind.1995) (memoran-

dum opinion on motion for preliminary injunction) ("this court believes that *Casey* effectively displaced *Salerno*'s application to abortion laws"); *Utah Women's Clinic v. Leavitt,* 844 F.Supp. 1482, 1489 (D.Utah 1994) ("to bring a facial challenge in good faith, one must reasonably believe that the statute is incapable of being applied constitutionally in a large fraction of the cases in which it is relevant."). The Fifth Circuit has disagreed, and continues to apply the *Salerno* standard when evaluating restrictions on abortion. *Barnes v. Moore,* 970 F.2d 12, 14 n. 2 (5th Cir.1992) ("we do not interpret *Casey* as having overruled, *sub silentio,* longstanding Supreme Court precedent governing challenges to the facial constitutionality of statutes").

The Supreme Court, itself, appears to be split on this issue. *Compare Fargo Women' Health Org. v. Schafer,* 507 U.S. 1013, 113 S.Ct. 1668, 123 L.Ed.2d 285 (1993) (O'Connor, concurring with denial of application for stay and injunction) (stating that the *Casey* approach should be followed by lower courts), *with Ada v. Guam Society of Obstetricians and Gynecologists,* 506 U.S. 1011, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, dissenting from denial of petition for writ of certiorari) (stating that Court did not change the *Salerno* standard in *Casey* ).

Not surprisingly, whereas Plaintiff has urged this Court to adopt the *Casey* approach, Defendants have vigorously argued that the *Salerno* standard should be employed. Because the Sixth Circuit is silent on the issue of whether *Salerno* should apply to pre-viability abortion regulations, it is a matter of first impression in this Circuit.

This Court concludes that for purposes of evaluating the ban on the D & X procedure, which is used in the weeks preceding viability, this Court will follow the approach actually undertaken in *Casey,* and employed by courts in the Third, Seventh, Eighth, and Tenth Circuits, and ask whether, "in a large fraction of the cases in which [the ban] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." This Court makes this decision for two reasons. First, because *Casey* did

not require that every married woman be subject to physical abuse in striking down the spousal notification requirement, the plaintiffs in that case did not have to show that "no set of circumstances exist under which the law would be invalid" in order to successfully challenge it. Second, it seems that it would be impossible, as a practical matter, to evaluate whether a regulation will create an undue burden on the right to an abortion, *without* examining specific facts in the record, and evaluating the likely impact that a regulation will have on the specific group of women who are affected by it. For these reasons, this Court declines to apply *Salerno* to the challenged pre-viability regulations in this case.

■ Although this Court has concluded that it will not apply *Salerno* to the pre-viability regulations in House Bill 135, the issue of whether *Salerno* should apply to the post-viability regulations in House Bill 135 is a separate issue. For purposes of evaluating the ban on post-viability abortions, therefore, this Court must likewise consider whether it is bound to apply the more restrictive *Salerno* standard.[12]

Whether the *Salerno* standard for facial challenges should apply to post-viability regulations appears to be an issue of first impression before this, or any, Court. *Casey* is not dispositive, because the approach in that case is specifically designed to evaluate whether a law restricting access to *pre-viability* abortions would impose an "undue burden" on a large fraction of the relevant population; it does *not* evaluate whether a law restricting access to *post-viability* abortions is invalid simply because it may jeopardize the life or health of a few (or many) pregnant women who need such an abortion. Indeed, none of the cases cited above which followed the new *Casey* approach involved restrictions on post-viability abortions. Thus, this appears to be an issue of first impression in this, or any, Court.

After careful consideration of the interests involved, this Court concludes that the *Salerno* requirement that the plaintiff must show that "no set of circumstances exists under which the law would be valid," should *not* apply to facial challenges to post-viability abortion regulations which may unconstitutionally threaten the life or health of even a few pregnant women. The Court so holds for three reasons. First, the cases which have applied *Salerno* have not involved laws which threaten to inflict, unconstitutionally, such severe and irreparable harm.[13] Second, because the Supreme Court signalled in *Casey* that an unconstitutional infringement of the liberty interests of some, but not all, pregnant women, is sufficient to justify application of a lesser standard where a pre-viability abortion is concerned, there is no reason why the Court would not similarly apply a lesser standard where a law threatens to deprive some, but not all, pregnant women of their greater constitutional interest in their own life and health. Finally, and most importantly, it would be unconscionable to hold that a pregnant woman—or her estate—may not challenge a post-viability regulation until *after* she is unconstitutionally deprived of her life or health. Therefore, this Court will allow Plaintiff to facially challenge this post-viability ban, even though he

12. Defendants have argued, for example, that the testimony given by Jane Doe Number One and Jane Doe Number Two—both of whom would have been adversely affected by this ban on post-viability abortions—should be disregarded by this Court, because *Salerno* requires that the law be unconstitutional in *all* of its applications, rather than in a few or many situations. Because this is a facial challenge, Defendants argue, such testimony as to how the law may affect specific individuals is irrelevant.

13. In *Rust,* the Court applied *Salerno* to a facial challenge to regulations which restricted the ability of facilities receiving Title X funding to counsel, make referrals, or advocate, abortion. 500 U.S. at 183, 111 S.Ct. at 1767. In *Akron*

*Center for Reproductive Health,* plaintiffs brought a facial challenge to a parental notification statute; in considering the judicial bypass procedure, the Court applied *Salerno,* rejecting arguments that the procedure's time requirements might be construed as "business days" instead of "calendar days," and reasoning that the statute should not be invalidated "based on a worst-case analysis that may never occur." 502 U.S. at 514, 112 S.Ct. at 834. Finally, in *Webster,* Justice O'Connor stated that *Salerno* should apply to a Missouri provision that prohibited the use of public facilities to perform abortions not necessary to save the life of the mother. 490 U.S. at 523, 109 S.Ct. at 1991–92.

has not shown that "no set of circumstances" exists under which the ban would be valid.

## B. Standard for Vagueness Challenges

■■■ In addition to arguing that this Act is unconstitutional under *Casey*, Plaintiff argues that the Act is unconstitutionally vague. When determining whether a statute or regulation is sufficiently vague so as to violate due process, there are several relevant considerations. A statute or regulation may be vague if it fails to give fair warning as to what conduct is prohibited. *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"), *cited in Fleming v. United States Dept. of Agriculture*, 713 F.2d 179, 184 (6th Cir.1983). A statute or regulation may also be vague if it is subject to arbitrary and discriminatory enforcement, due to a failure to provide explicit standards for those who apply the law. *Id.* Finally, the lack of a *mens rea* requirement in a statute which imposes criminal liability may indicate that the statute is unconstitutionally vague. *Colautti v. Franklin*, 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979) ("Because of the absence of a scienter requirement in the provision directing the physician to determine whether the fetus is or may be viable, the statute is little more than 'a trap for those who act in good faith.' ").

A vague law is especially problematic in two situations. First, its potential to cause citizens to " 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked," *Id.* (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 1322–23, 12 L.Ed.2d 377 (1964)), is of particular concern where the exercise of constitutionally protected rights may be inhibited or "chilled." *Colautti v. Franklin*, 439 U.S. 379, 391, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979) (applying to the right to an abortion); *Baggett*, 377 U.S. at 372, 84 S.Ct. at 1322–23 (applying to First Amendment rights). Second, a vague law which provides for criminal penalties is troubling because of the severe consequences which may result

from violating the law. *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). When determining whether a law is void for vagueness, this Court must examine the challenged law in light of all of the above considerations.

This Court now turns to Plaintiff's arguments challenging the constitutionality of the D & X ban, the post-viability ban, and the viability testing requirement, for purposes of gauging whether the likelihood of Plaintiff's success on the merits of these arguments is substantial.

## C. Ban on Use of the D & X Procedure

### 1. Vagueness of the Definition of D & X

■■ House Bill 135 bans the performance or attempted performance of any abortion, pre-viability or post-viability, by use of the Dilation and Extraction ("D & X") procedure, which is defined as follows:

> [T]he termination of a human pregnancy by purposely inserting a suction device into the skull of a fetus to remove the brain. 'Dilation and extraction procedure' does not include either the suction curettage procedure of abortion or the suction aspiration procedure of abortion.

O.R.C. § 2919.15(A). Plaintiff argues that this definition is unconstitutionally vague, because it does not adequately distinguish the D & X procedure from a different procedure known as the Dilation and Evacuation ("D & E") procedure. Plaintiff further argues that this vagueness will chill physicians from performing abortions by use of the D & E method, which is the most common method used in the early to mid-second trimester. Defendants dispute this, arguing that the definition does not include or describe the D & E procedure, and so is not vague; further, Defendants argue that the D & E procedure is included in the definition of suction curettage, and so is excepted from the ban.

In order to address this vagueness argument, it is necessary to define and describe the various methods of abortion, based on the testimony in this case. When the procedures are described in detail, it becomes apparent that the statutory definition of the Dilation

and Extraction procedure could be construed to include the more widespread Dilation and Evacuation ("D & E") procedure. It also becomes apparent that the D & E method is *not* included in any definition of suction curettage: although a D & E procedure does include suction curettage, it also includes additional steps, such as dismemberment, and additional instruments, such as forceps. Furthermore, suction curettage is a first-trimester procedure, whereas D & E is a second-trimester procedure. Accordingly, Plaintiff has demonstrated a substantial likelihood of success of showing that the definition of a D & X procedure is unconstitutionally vague.

### a. suction curettage/aspiration

Suction curettage and suction aspiration (also known as vacuum aspiration) are common methods of first-trimester abortions, and the terms are used interchangeably (Tr., 12/6, at 13, 115).[14] In a suction curettage procedure, the doctor mechanically dilates the opening to the uterus by the use of metal rods, inserts a vacuum apparatus into the uterus, and removes the products of conception by the use of negative suction (Tr., 12/5, at 33). There is no need to dilate the patient's cervix in the days before the procedure is performed (*Id.*). Suction curettage/aspiration can sometimes be performed up to the 15th week of pregnancy, but is typically a first-trimester procedure (*Id.*). Approximately ninety-five percent of the abortions which are performed in this country are performed during the first fifteen weeks of pregnancy[15] (Tr., 12/6, at 13).

### b. Dilation & Evacuation (D & E)

In the second trimester, the fetus becomes too large to remove by use of suction curettage (Tr., 12/5, at 33–34). At that point, the most common abortion method is a Dilation and Evacuation (D & E) procedure; indeed, it is the only procedure which can be used from the thirteenth to sixteenth weeks of pregnancy (Tr., 11/8, at 51). Instead of using metal rods to dilate the cervix over a short period of time, the doctor inserts laminaria into the cervix during the one-to-two day period prior to the procedure, in order to slowly dilate the cervix. Then, a suction curette with a larger diameter is placed through the cervix, and the doctor removes some, or all, of the fetal tissue.

Frequently, however, the torso and the head cannot be removed in this manner (Tr., 12/5, at 35). The procedure typically results, therefore, in a dismemberment of the fetus, beginning with the extremities. This dismemberment is accomplished both by use of the suction curettage, and by the use of forceps (*Id.*).

Removing the head of the fetus from the uterus is typically the most difficult part of the D & E procedure, in part because the head is often too large to fit through the partially dilated cervix. It is important to remove the head as quickly as possible, because fetal neurologic tissue can negatively affect the mother's ability to clot, and lead to greater bleeding (Tr., 12/6, at 32). Physicians have developed different methods of decompressing the head, in order to remove it.

Dr. Anthony Levatino testified that when he performed D & E abortions, he preferred to grasp the fetal head with a clamp, crush it, and remove it in pieces along with the skull contents (Tr., 12/7, at 190). Because he decompressed the skull by crushing it, he found it unnecessary to decompress the skull by purposely inserting a suction device into the skull and removing some of its contents (*Id.* at 192).

---

**14.** The transcripts of the hearing testimony are, for the most part, paginated separately for each day of testimony. Therefore, when referring to transcript testimony throughout this opinion, this Court will indicate the date of the transcript, as well as the page on which the specific reference may be found.

**15.** The testimony indicates that some women who seek abortions in their second trimester are victims of rape or incest, and may have been psychologically unable to face their pregnancies at an earlier time (Tr., 11/8, at 27). Other women who seek abortions in the second trimester do so because it is only then that they discover that their fetus has developed severe anomalies, i.e., physical defects that call into question the ability of the fetus, once carried to term, to survive (Tr., 12/5, at 103–08).

Dr. Paula Hillard testified that when the skull is too large to remove intact, she grasps the skull and suctions out its contents with a cannula—which may enter the skull—in order to decompress it and facilitate its removal (Tr., 11/8, at 77). She has never performed the procedure utilized by Dr. Haskell (*Id.* at 49).

Dr. Doe Number One testified that because the use of forceps can cause trauma to the mother's uterus, his preference is to collapse the head by the use of suction, prior to its removal. By making a small incision at the base of the skull and inserting a suction device into the brain—while the head is still within the uterus, and no longer attached to the body—he can collapse the head and easily remove it, without the use of forceps (Tr., 12/5, at 43). This method decreases injury to the cervix and uterus, and reduces operating room time, blood loss, and anesthesia time (*Id.* at 44). Dr. Doe describes his procedure as a D & E, and collapses the head by the use of suction even in procedures performed from 15 to 18 weeks. Although he does not always collapse the head in this fashion, Dr. Doe Number One testified that the two procedures—D & E with collapse, and D & E without collapse—are on a continuum (*Id.* at 72). He has never performed the procedure utilized by Dr. Haskell (*Id.* at 84).

Dr. Mary Campbell has not performed second-trimester abortions, but has read about and observed various second-trimester methods, in preparation for setting up a second-trimester practice at her clinic. In describing the D & E procedure, she testified that the fetal skull is generally not intact following dismemberment of the body—the jaw is often removed with the neck—and "the edges of the fetal skull are sharp enough to lacerate the maternal uterine [blood] vessels ..." (Tr., 12/6, at 35). The goal is therefore to place the suction cannula into the skull in order to remove its contents and make it smaller, thereby allowing it to be removed intact, in order to minimize lacerations (*Id.* at 33). In addition, removing the head intact is advantageous because it ensures that no parts of the skull are left behind in the woman's uterus (*Id.* at 35).

Dr. Harlan Giles, who performs D & E abortions up to the twentieth week of pregnancy, testified that he had never seen an instance in which the fetal head was too large to be removed without being crushed or somehow decompressed, but he admitted that such an occurrence was possible (Tr., 11/13, at 269–70; Tr., 12/8, at 41).

The D & E procedure appears to be preferable to other available procedures before the twentieth week; at thirteen to sixteen weeks, it is the only available procedure. The main alternative to a D & E procedure after sixteen weeks is an induction or instillation method, which involves either the injection of saline, urea, or prostaglandins into the amniotic cavity, or, the insertion of vaginal prostaglandin suppositories. These procedures result in labor, and are further described below. The D & E procedure appears to be less painful for the mother than induction procedures, because it does not require labor, and because the cervix is dilated slowly with laminaria rather than being dilated more forcefully by uterine contractions. In addition, the D & E procedure takes less time, generally between ten and twenty minutes, as opposed to twelve to thirty-six hours. Because the uterus is not under pressure over a long period of time, there is less of a risk of forcing fluids or fetal proteins into the maternal circulation (Tr., 12/6, at 31). Finally, there is a reduced risk of retained products of conception, infection, hemorrhage, and cervical injury (*Id.* at 39).

Although the D & E procedure appears to have a lower rate of complications than other methods of abortion in the early to mid-second trimester, it can be equally risky at later periods, when the fetus is larger. One serious complication of later D & Es is caused by the use of forceps, which results in uterine and cervical injuries, and increased blood loss (Tr., 12/5, at 41).

### c. Dilation and Extraction (D & X)

In this section, the Court will describe Dr. Haskell's specific method of abortion, which has been described by various parties as either an "intact D & E," a "brain suction procedure," or a "Dilation and Extraction" procedure. It is typically used late in the

second trimester, from twenty to twenty-four weeks.

Plaintiff Haskell described his procedure in a paper presented at the National Abortion Federation Conference in 1992 (Defendant's Exhibit A). The following description is taken from that paper.

On the first and second days of the procedure, Dr. Haskell inserts dilators into the patient's cervix. On the third day, the dilators are removed and the patient's membranes are ruptured.[16] Then, with the guidance of ultrasound, Haskell inserts forceps into the uterus, grasps a lower extremity, and pulls it into the vagina. With his fingers, Haskell then delivers the other lower extremity, the torso, shoulders, and the upper extremities. The skull, which is too big to be delivered, lodges in the internal cervical os.[17] Haskell uses his fingers to push the anterior cervical lip out of the way, then presses a pair of scissors against the base of the fetal skull. He then forces the scissors into the base of the skull, spreads them to enlarge the opening, removes the scissors, inserts a suction catheter, and evacuates the skull contents. With the head decompressed, he then removes the fetus completely from the patient.

The primary distinction between this D & X procedure and the D & E procedure previously described appears to be that, whereas

the D & E procedure results in dismemberment and piece-by-piece removal of the fetus from the uterus—and, possibly, in removal of portions of the skull contents by the use of suction after the skull is crushed with forceps or otherwise invaded, and *before* the head is placed next to the opening to the uterus—the D & X procedure results in a fetus which is removed basically intact except for portions of the skull contents, which are suctioned out *after* the head is placed next to the opening to the uterus (and after the rest of the fetus is removed from the uterus), and before the fetus is fully removed from the mother's body.[18] The hallmark of the D & X procedure, therefore, is that the fetus is removed intact, rather than being dismembered prior to removal, as is done in a D & E procedure. In both procedures, the head usually must be decompressed, either by crushing the skull, or by invading the skull and suctioning out its contents. In the D & X procedure, the suctioning is purposeful; in a D & E procedure, the suction may either be purposeful, or, given the inability to clearly see the fetus, even with ultrasound, and the consequent difficulty of knowing whether the surgical instrument is in, or simply near, the skull, it may be accidental.

The testimony indicates that the D & X procedure may be considered to be a variant of the D & E technique.[19] Indeed, doctors

---

**16.** Defendants pointed out that, in the videotape in which Dr. Haskell demonstrates the procedure (Defendant's Exhibit R), the patient's membranes had ruptured (her "water had broken") prior to the procedure, on the very first day. Although this fact might be relevant if this were a medical malpractice action brought by that particular patient, it is not relevant to the issue of whether the D & X procedure is generally safe for the mother's health.

**17.** Although Dr. Haskell does not state in his paper that he cuts the umbilical cord prior to penetrating the base of the skull with scissors, he testified that he routinely cuts the cord, and he did so on the videotape which demonstrates this procedure (Defendant's Exhibit R). Further, although the Court notes that it generally takes eight to ten minutes for the fetus to die, following the cutting of the umbilical cord, and that, on the videotape, Haskell waited only thirty seconds from the time he cut the cord to the time he inserted the scissors, this Court also notes that the fetus in the videotape appeared to be dead at the beginning of the procedure.

**18.** If the skull could not be decompressed by suctioning out part of the contents, and yet was too big to pass through the cervix, it apparently would have to be crushed in order to remove it.

**19.** The testimony indicates that each physician's surgical procedures may differ from similar procedures used by other physicians (Tr., 12/6, at 103). Indeed, physicians experiment with and develop their own variants of surgical techniques, and then use them, even if those variants are not specifically approved in a peer review journal (*Id.* at 104).

In this case, Dr. John Doe Number One testified that he developed a procedure which is similar to Haskell's D & X procedure for use in his D & E procedures at fifteen to eighteen weeks: after the extremities of the fetus are dismembered and removed, he collapses the head by making an incision and then using suction to decompress the skull, instead of crushing it with forceps, so that he can remove the skull intact (Tr., 12/5, at 42–44). Dr. John Doe Number Two, who uses Haskell's D & X procedure in

who use the procedure may not know which procedure they will perform until they encounter particular surgical variables and circumstances after they begin the procedure to terminate the pregnancy.[20] The doctor may intend to do a D & X in cases where the patient has requested an intact fetus for purposes of genetic testing, or, perhaps, where a patient has a history of Cesarean sections and a uterine scar, and thus is more vulnerable to uterine injury (Tr., 12/7, at 89).

Based on the testimony of various physicians, this Court further finds that in both the D & E and the D & X procedures, a suction device may be purposely inserted into the skull in order to remove the skull contents, to accomplish the goal of decompressing the fetal head, thereby facilitating its removal from the woman's body. Because the statutory definition of the prohibited "Dilation and Extraction Procedure" thereby appears to encompass the purportedly allowable D & E procedure as well, Plaintiff has demonstrated a substantial likelihood of success of showing that this definition is unconstitutionally vague, as it does not provide physicians with fair warning as to what conduct is permitted, and as to what conduct will expose them to criminal and civil liability.[21]

### 2. Constitutionality of Banning the Specific Abortion Procedure at Issue

■ As far as this Court is aware, only one case has considered the propriety of a ban on a specific abortion procedure. In *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Supreme Court struck down a ban on the second-trimester abortion method of saline amniocentisis. The Court reasoned that, because the method was commonly used and was safer than other available methods, it failed to serve the stated purpose of protecting maternal health. The Court concluded that, given that there were no safe, available alternatives to the banned method, the ban was "an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, the vast majority" of second trimester abortions. Accordingly the ban was held to be unconstitutional. *Id.* at 75–79, 96 S.Ct. at 2844–46.

■ The reasoning in *Danforth* suggests that a state may act to prohibit a method of abortion, if there are safe and available alternatives. This reading comports with *Casey*, which dictates that if a ban on a specific method were to place a substantial obstacle in the path of a woman seeking a pre-viability abortion—for example, if there were no safe and available alternative method of abortion—the ban would be an undue burden and therefore unconstitutional. The issue before this Court, therefore, is whether, in Ohio, there are safe and available alternatives to the D & X procedure, which is typically performed during the twentieth to twenty-fourth weeks of pregnancy, such that there would be no undue burden if the procedure were banned.

### a. D & E Procedure

Due to the larger size of the fetus in the mid to late-second trimester, when the fetus is not necessarily viable, the D & E is no longer the procedure of choice to perform an

---

situations where an intact fetus is requested, or if the fetus is breech (feet first), testified that he considers the D & X procedure to be a modification of the D & E procedure (Tr., 12/6, at 47–48).

**20.** Dr. Doe Number Two testified, for example, that he uses the D & X procedure in the specific circumstances when the fetus is "double footling breech" and comes out feet first, resulting in a trapped head. At that point, he has "no room to work" because the head is trapped in the lower uterine segment, and must try to finish the procedure as quickly as possible to lower the risks to the mother. In that circumstance, the D & X procedure is the safest and fastest method. If he were prohibited from suctioning out the skull

contents to decompress the head, he would have to dismember the head from the body, push the detached head back up into the uterus, crush the skull with the appropriate instruments, and then remove it in pieces (Tr., 12/7, at 76).

**21.** In addition, this Court notes that House Bill 135 bans not only the performance of D & X abortions, but also the *attempted* performance of D & X abortions. Given this Court's finding that the D & X procedure is on a continuum with the D & E procedure, this phrase adds confusion as to when a doctor, who is performing a D & E abortion, *attempts* to perform a D & X, and thus incurs criminal and civil liability.

abortion.[22] Therefore, in considering the safest method of abortion at this stage of pregnancy, this Court will compare the D & X procedure—which is typically performed from the twentieth to the twenty-fourth weeks of pregnancy—to other available procedures.

### b. Instillation/Induction Procedures

The main alternative to the D & X procedure, in the late second trimester, is the use of an induction method of abortion. Induction methods are also known as "instillation" methods. In one type of induction method, the physician injects some substance—typically saline, or a combination of a prostaglandin and urea—into the amniotic cavity of the woman. In another type, the physician places prostaglandin suppositories into the patient's vagina. In both cases, the end result is labor: the substances cause the uterus to contract, resulting in the eventual expulsion of the fetus. This labor typically lasts between twelve and twenty-four hours (Tr., 12/6, at 25), but may last as long as thirty-six hours (Id. at 118).

The evidence suggests that induction methods were more frequently used in the 1970s, when the D & E procedure was just being developed. Also, induction procedures are more often used by less skilled physicians (Id. at 22). Finally, they must be performed in a hospital environment, and so cannot be done on an outpatient basis.

There appear to be two advantages which induction methods have over the D & E procedure: they require less skill to perform, and they do not involve the placement of any sharp instruments into the uterus (Id. at 29).

One obvious disadvantage of the induction method is that it results in labor, with all of its potential complications. These may include: fear, lack of control, mild to severe abdominal pain, nausea, and diarrhea, and extreme discomfort, over a lengthy period of time. The substances used, especially saline, may result in mild side effects—vomiting,

diarrhea, and high fever—or in severe maternal complications. The fluids which are introduced may be forced into the maternal circulation, leading either to amniotic fluid embolus, which is generally fatal, or to disseminated intravascular coagulation (DIC), in which the clotting factors in the blood are used up, and bleeding cannot be stopped. Induction methods can also thin out the lower uterus to the point that the fetus comes through the uterine wall instead of through the vagina (Tr., 12/6, at 25–26). In addition, induction methods cannot be performed on women who have an active pelvic infection, or who are carrying dead fetuses (Id. at 26), and probably should not be performed on women who had previously had Cesarean sections, given the possibility of rupturing the uterine scar (Id. at 28). Finally, induction methods may be ineffective in cases where the fetus is lying with its head on one side and its feet on the other, because there is no pressure against the cervix (Id. at 27), and the fetus will not be expelled from the uterus.

### c. Hysterectomy/Hysterotomy

Another alternative to the D & X is a hysterotomy, which is essentially a Cesarean section performed before term, although it is potentially more dangerous because the uterus is thicker than it is at the end of term, and the incision causes more bleeding and may make future pregnancies more difficult. A more extreme alternative is a hysterectomy, which removes the uterus completely. Both of these methods entail the risks associated with major surgical procedures, and are rarely used today.

### d. D & X Procedure

 Before discussing the apparent benefits and risks of the D & X procedure, it is necessary to address Defendant's arguments that the procedure has no measurable benefits, for the reason that no peer review journal has published any studies measuring these benefits. The Court acknowledges

**22.** Additional obstacles to performing a D & E after the twenty-second week of pregnancy include: the presentation of the fetus, in which the spine is oriented toward the cervix, and the toughness of the fetal tissues; both of these factors make it more difficult to dismember the fetus (Tr., 11/8, at 177). Because the operating time is thereby increased, this can cause heavy blood loss (Id. at 178).

that if there were a statistical study, published in a peer review journal, which demonstrated the benefits of the D & X procedure, this would make the asserted benefits more credible. Nevertheless, the lack of a study in a peer review journal does not, *ipso facto*, mean that there are no benefits, or no risks. Indeed, in this situation, there are a number of factors which help to explain the lack of such a statistical study.

First, the D & X procedure is relatively new—it apparently was first described in 1992—and it will take time for other practitioners to begin using and evaluating the procedure. Second, given the security concerns which must be considered by doctors who perform abortions, physicians who use the D & X procedure may be understandably reluctant to publicly acknowledge that they use this procedure, and may be even more reluctant to participate in a study and publish the results. Finally, as was testified to by Dr. Mary Campbell, funding for studies of abortion methods was cut drastically in the early 1980s, and there have been no large-scale abortion studies since that time (Tr., 12/6, at 74, 76). Given these obstacles to performing and publishing statistically valid studies on new abortion methods, this Court is not persuaded that the absence of a study on D & X abortions in the medical literature means that the procedure has no benefits.[23]

Dr. George Goler, the Ohio Section Chief of the American College of Obstetricians and Gynecologists, testified that he views Dr. Haskell's procedure as an improvement over the traditional D & E procedure, because it causes less trauma to the maternal tissues (by avoiding the break up of bones, and the possible laceration caused by their raw edges), less blood loss, and results in an intact fetus that can be studied for genetic reasons (Tr., 12/6, at 126). Dr. Haynes Robinson, a pathologist and geneticist, testified that it is sometimes desirable to obtain an intact fetus in order to confirm the presence of fetal anomalies, and to predict their likely recurrence in future pregnancies (Tr., 12/5, at 118). Although an intact fetus can be obtained following an induction or instillation procedure—and such a method might be preferable where the brain needs to be studied intact—the use of various substances to induce labor can cause autolysis, or the breaking down of tissue, which may make the fetal tissue less useful for such studies (Tr., 12/6, at 34). A further advantage over induction or instillation procedures is that the D & X procedure takes far less time—ten to twenty minutes—than the twelve to thirty-six hours in which a woman must be in labor following an induction or instillation procedure.[24]

Plaintiff Haskell testified that, in approximately 1,000 D & E procedures performed after the twentieth week of pregnancy, two patients had serious complications (Tr., 11/8, at 149). In approximately 1,000 D & X procedures performed after the twentieth week of pregnancy, there were no serious complications (*Id.* at 150–51). Although this is anecdotal, not statistical, evidence, this Court finds that it is both uncontradicted and plausible.

Dr. Levatino, who has performed D & E but not D & X abortions, predicted that the D & X procedure would have greater complications than the induction methods, because there is an increased possibility of perforating the patient's uterus when the abortion is performed in the late second trimester (Tr., 12/7, at 198, 205). This testimony appears,

---

**23.** In addition, and for similar reasoning, this Court is unpersuaded by the Defendant's argument that the D & X procedure is not within the accepted medical standards. This is a new, controversial procedure. As Dr. Goler testified: "I don't think enough people know about it to really say its within the accepted standards of practice. I think, as it gets to be better known and the results [are] published, it will be." (Tr., 12/6, at 133–34). Given the recent development of the D & X procedure, the fact that no publication has concluded, to date, that it is within acceptable medical standards, is not dispositive.

**24.** This Court rejects Defendant's claim that the D & X procedure takes longer, because it requires the insertion of laminaria one or two days before the procedure. Dr. Doe Number Two testified that the insertion of laminaria does not impair the woman's ability to function in any way, nor does it cause major discomfort, although it may cause some cramping. This does not compare to the more traumatic experience of going through labor.

however, to have been based less on his analysis of the specific procedure than on his estimate of the risks of performing late-term D & E abortions, generally. As noted earlier, the D & E procedure can be risky in the late-second trimester, because the fetus is larger and more difficult to dismember, and the use of forceps in the uterus becomes more dangerous. The D & X procedure mitigates this risk by delivering the fetus intact—except for a decompression of the head *after* it has been placed next to the opening to the uterus—and thus would not appear to bear an increased risk of uterine perforation. Although forceps are still used, their use appears to be minimized.

Dr. Giles testified that the procedure is not new, but is rather a resurrection of an obstetric method discarded in the 1960s, which was used to deliver dead fetuses, and known as craniotomy (Tr., 12/8, at 18–23). His criticisms of the D & X procedure on this ground are not persuasive. First, the reason for the abandonment of the craniotomy procedure—which required the use of sharp instruments, and caused uterine lacerations and perforations—does not appear to be relevant to the D & X procedure, which reduces the risk of uterine lacerations (in comparison to the D & E procedure) by delivering all but the head of the fetus intact, which is then decompressed by the use of scissors and suction. Second, unlike the situation in the 1960s, ultrasound can now be utilized to help to avoid injury when sharp instruments are introduced into the uterus.

Finally, in regard to the availability of the D & X procedure, it can be performed on an outpatient basis, and does not require hospitalization. Although the procedure requires three separate visits to the clinic, the insertion of laminaria on days one and two takes less than an hour (Tr., 12/5, at 22), and the D & X procedure itself, which is performed on the third day, requires a total time of less than two hours (*Id.*). At least three doctors in Ohio perform some variation of the D & X procedure: Plaintiff Haskell (Tr., 11/8, at 109–10); Dr. John Doe Number One (Tr., 12/5, at 43); and Dr. John Doe Number Two (Tr., 12/7, at 47–48).

### e. Conclusion

After viewing all of the evidence, and hearing all of the testimony, this Court finds that use of the D & X procedure in the late second trimester appears to pose less of a risk to maternal health than does the D & E procedure, because it is less invasive—that is, it does not require sharp instruments to be inserted into the uterus with the same frequency or extent—and does not pose the same degree of risk of uterine and cervical lacerations, due to the reduced use of forceps in the uterus, and due to the removal of any need to crush the skull and remove it in pieces, which can injure maternal tissue.

This Court also finds that the D & X procedure appears to pose less of a risk to maternal health than the use of induction procedures, which require the woman to go through labor, pose additional risks resulting from the injection of fluids into the mother, and cannot be used for every woman needing an abortion.

Finally, the Court finds that the D & X procedure appears to pose less of a risk to maternal health than either a hysterotomy or a hysterectomy, both of which are major, traumatic surgeries.

Because the D & X procedure appears to have the potential of being a safer procedure than all other available abortion procedures, this Court holds that the Plaintiff has demonstrated a substantial likelihood of success of showing that the state is not constitutionally permitted to ban the procedure. If this abortion procedure, which appears to pose less of a risk to maternal health than any other alternative, were banned, and women were forced to use riskier and more deleterious abortion procedures, the ban could have the effect of placing a substantial obstacle in the path of women seeking pre-viability abortions, which would be an undue burden and thus unconstitutional under *Casey.*

Even if induction procedures were as safe as the D & X procedure—and this Court does not find, on the evidence, that they are as safe—the requirement that a pregnant woman be hospitalized in order to undergo an induction procedure may also have a negative impact on the practical availability of

abortions for women seeking pre-viability abortions. First, hospitals may refuse to allow induction procedures on an elective basis,[25] including those situations in which a woman wishes to abort a fetus with severe anomalies. Second, it may be psychologically daunting to undergo the induction procedure in the hospital environment.[26] These practical problems may discourage women in their second trimester from exercising their right of seeking elective, pre-viability abortions, or make it practically impossible to do so, thereby amounting to an undue burden on the right to seek a pre-viability abortion. In contrast, the D & X procedure can be performed on an outpatient basis within a much shorter period of time, and is not limited by either of these practical problems.

For both of these reasons—because the D & X procedure appears to be the safest method of terminating a pregnancy in the late second trimester, and because the D & X procedure is more available than induction methods, which require the woman to be hospitalized—this Court holds that Plaintiff has demonstrated a substantial likelihood of success of showing that the ban on the D & X procedure is unconstitutional under *Danforth* and *Casey*.[27]

### 3. Legitimacy of the State's Asserted Interest in Banning the D & X Procedure

■ Next, this Court turns to the state's asserted interest in enacting the ban on the D & X procedure, and to the constitutional legitimacy of that interest. The Ohio General Assembly declared that its intent in banning the D & X procedure was: "to prevent the unnecessary use of a specific procedure used in performing an abortion. *This intent is based on a state interest in preventing unnecessary cruelty to the human fetus.*" House Bill 135, Sec. 3 (emphasis added).

In *Casey*, the Supreme Court recognized two specific interests which the state has in regulating abortions prior to viability. First, "to promote the State's profound interest in potential life throughout pregnancy the State may take measures to ensure that the woman's choice is informed, and [these] will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion." 505 U.S. at 878, 112 S.Ct. at

---

**25.** For example, Miami Valley Hospital, in Dayton, Ohio, only permits therapeutic abortions, and does not allow their performance on an elective basis (Defendant's Exhibit F). Dr. George Goler, the Ohio Section Chief of the American College of Obstetricians and Gynecologists, also testified that "it's gotten to the point now where many of the hospitals do not have facilities" to perform abortions by use of induction methods (Tr., 12/6 at 118). Although Dr. Harlan Giles, a Pennsylvania physician, testified that it was his opinion that several Ohio facilities allowed the performance of elective abortions (Tr., 11/13, at 237), this Court is more inclined to rely on the testimony of Dr. Goler, who practices in Ohio, and whose testimony was specifically directed toward second-trimester abortions. This Court concludes that the preponderance of the evidence is that few Ohio hospitals allow non-therapeutic, second-trimester abortions.

**26.** Dr. Doe Number One, who used to perform induction procedures but now performs a version of the D & X procedure, testified that hospitals and hospital personnel view induction procedures as a "second-class procedure" performed on "second-class patients," and that the problem is exacerbated by the practice of locating the woman obtaining the abortion in close proximity to women giving birth (Tr., 12/5, at 37–38). Dr. Mary Campbell also testified that it's depressing for the patient to undergo an abortion procedure

in the labor and delivery area of a hospital: "These are families often with wanted pregnancies gone awry who in the course of their time in the hospital ... get to hear several other families through closed doors ... shouting rather happily ... it's a boy or it's a girl." (Tr., 12/6, at 28–29).

**27.** Defendants have argued that the affirmative defense, codified at O.R.C. § 2919.15(C), saves the ban from being an undue burden. Under the affirmative defense, if a physician who is prosecuted for performing a D & X procedure can present *prima facie* evidence that all other procedures would have posed a greater risk to the mother's health, then the prosecutor has the burden of proving, beyond a reasonable doubt, that at least one other abortion method would not have posed a greater risk to the mother's health.

Defendants' argument is unpersuasive, for two reasons. First, the certainty of arrest and prosecution is certain to chill physicians from performing the D & X procedure, even where it is the least risky method of abortion. Second, even if there were no chilling effect, the challenged law restricts the availability of D & X procedures to situations where it is obviously and irrefutably the safest method. Given this Court's findings that the D & X procedure may be safer and more available than other methods of abortion, this would still amount to an undue burden.

2821. Second, "the State may enact regulations to further the health or safety of a woman seeking an abortion." *Id.* Neither of these interests, however, justify regulations which impose an undue burden on the right to seek a pre-viability abortion.

Because *Casey* only specifically mentioned these two interests, Plaintiff argues that any other interest—such as that of preventing unnecessary cruelty to the fetus during the abortion—is neither proper nor legitimate. Defendants argue that the interest is justified by the "State's profound interest in potential life throughout pregnancy," and that it would be contrary to logic and common sense to hold that this interest is not legitimate. The State further argues that if it is permitted to impose regulations which prevent cruelty to animals, then surely, it should be permitted to impose regulations which prevent cruelty to fetuses.

Again, this appears to be an issue of first impression before this, or any, Court. To this Court's knowledge, no abortion regulation has heretofore been justified by an interest in preventing unnecessary cruelty to the fetus. Moreover, this Court has no precedent to directly guide and inform its decision. There are, however, a few observations which help its analysis.

First, and foremost, this Court is mindful of *Casey*'s strong recognition of the State's interest in potential life throughout the pregnancy. Second, although *Casey* only specifically delineated a few interests which the state has which justify regulation, nowhere in the opinion did the Court hold that no other state interest could justify regulations on pre-viability abortions. These observations, taken together, suggest that the state may impose regulations which vindicate its interest in the potential life of the fetus, based on interests other than those of persuading the woman to choose childbirth over abortion, or of protecting her health and safety. Finally, the Court agrees with Defendants that it would be contrary to all logic and common

sense, to hold that a state has no interest in preventing *unnecessary* cruelty to fetuses.

Assuming *arguendo* that the interest is legitimate, however, *Casey* is clear in holding that regulations enacted to further legitimate interests may not impose an undue burden on the right to seek a pre-viability abortion. Because Plaintiff has demonstrated a substantial likelihood of success of showing that the ban on D & X abortions would impose an undue burden on the right, the legitimacy of the state's interest, no matter how legitimate or compelling, will, in all likelihood, once the merits of this litigation are determined, not save the ban from being unconstitutional.

Although the Court need not, at this point, address the testimony concerning the cruelty of the D & X procedure—given that Plaintiff has demonstrated a substantial likelihood of success of showing that the ban on the procedure is an undue burden and therefore is unconstitutional—it is in the public interest to discuss the issue of cruelty. Therefore, this Court now turns to the relevant testimony.

Defendants called two experts to testify to the pain felt by the fetus during the D & X procedure.[28]

Dr. Joseph Conomy is a professor of clinical neurology at Case Western Reserve University, and is involved in the issue of medical ethics. He has studied the formation of the nervous system, and has worked on problems of the nervous system in fetuses and newborn infants.

In regard to fetal neurology, Dr. Conomy testified that, at the age of twenty to twenty-four weeks, many of the neural pathways which transmit pain to the brain are established, although the cortical projections from the lower level of the brain, the thalamus, are not yet established (Tr., 11/13, at 301). It is his opinion, therefore, that pain can be transmitted to at least the lower levels of the brain at that age (*Id.* at 302).

---

**28.** Plaintiff Haskell testified that he didn't believe that fetal neurological development at twenty-four weeks would allow pain impulses to be transmitted to the brain (Tr., 11/8, at 179), and that a fetus of the same age lacked the cognitive ability to perceive pain (*Id.* at 180). Because Dr. Haskell was not qualified as an expert in the area of fetal neurology, this Court will not consider this testimony.

Dr. Conomy further testified that fetuses at the age of twenty to twenty-four weeks respond to nurturing stimuli, such as stroking the face, and noxious stimuli, such as pricking the skin, in different ways. Nurturing stimuli may cause a turning of the head, or pursing of the lips. Noxious stimuli will cause flexion and withdrawal (*Id.* at 300–302).

In reference to the D & X procedure, Dr. Conomy testified that it is his opinion that the procedure would prompt an unpleasurable stimulus to the fetus (*Id.* at 303). He also testified, however, that it would be "speculative" to try to "get inside the mind of a fetus, if there is one." (*Id.* at 301). Indeed, Dr. Conomy specifically refused to testify that a fetus can feel pain: although the fetus does "exhibit a class of responses that are characteristic of reflex response to obnoxious stimulation.... feeling is very much beyond that because it involves perception, designation, locality, and things that are far too speculative for me to assure you that a fetus feels." (*Id.* at 305). Thus, although Dr. Conomy testified that a fetus at the age of twenty to twenty-four weeks may physically respond to noxious stimuli, he did not testify that the fetus has a conscious, mindful awareness of the pain it is experiencing.

Finally, Dr. Conomy testified that a fetus who is aborted by the D & E procedure, which involves dismemberment, might experience as much discomfort as a fetus who is aborted by the D & X procedure (*Id.* at 307).

Defendants' second expert was Dr. Robert White, who is a professor of neurosurgery at Case Western Reserve University. He has been the director of a brain research laboratory for thirty years, but has not specifically studied pain or its mechanisms.

In his testimony, Dr. White defined "pain" as a physiological, or perhaps behavioral, expression resulting from the appreciation of a noxious stimulus (Tr., 12/7, at 119–120).

In particular reference to the mechanics of the D & X procedure, Dr. White testified that two maneuvers would cause pain to the fetus. First, the act of compressing, rotating, and pulling the fetus down into the birth canal—which also occurs during childbirth, at a more advanced age—must cause pain to the fetus (*Id.* at 131). Second, it was his opinion that the act of making an incision in the back of the neck and enlarging it—without, apparently, cutting any part of the nervous system—and then inserting a suction tube and evacuating the skull contents, must be painful (*Id.*).

Initially, Dr. White testified that it was his opinion that the fetus *may* feel pain during the D & X procedure; this answer was stricken from the record because it did not indicate an opinion within reasonable medical *probability* (*Id.* at 110–11). Later in his testimony, and after viewing a videotape of the procedure being performed on a dead fetus, Dr. White amended his opinion to state that the fetus *can* feel pain (*Id.* at 124). He based this opinion partly on the small size of the infant, which means that pain travels a much shorter distance than in adults, and partly on his opinion that chemicals in the brain which suppress pain are not established in fetuses, whereas, chemicals which reinforce pain are so established (*Id.* at 126–27). He also disputed Dr. Conomy's opinion that the cortical projections from the thalamus are not established at twenty-four weeks (*Id.* at 158–59).

In regard to whether a fetus at twenty-four weeks can consciously experience pain, Dr. White noted that the problem is "what we consider consciousness." (*Id.* at 162). He did admit, however, that he did not know "at what particular stage in the gestational [age] ... that an infant is conscious." (*Id.* at 163).

Finally, Dr. White testified that the D & E procedure would also be painful for the fetus, although the nervous system is more formed at twenty to twenty-four weeks, when the D & E procedure is used on a less frequent basis (*Id.* at 164).

Based on this testimony, this Court concludes the following: first, there is evidence that a fetus of age twenty to twenty-four weeks will react, physiologically, to noxious stimuli. Second, the evidence is inconclusive as to whether the pain impulses are transmitted to the higher levels of the brain at that age. Third, the evidence is inconclusive as to

whether the D & X procedure is more painful than the D & E procedure.[29]

Finally, and most importantly, neither Dr. Conomy nor Dr. White testified that a fetus at age twenty to twenty-four weeks experiences a conscious awareness of pain. Although Defendants have suggested that there needn't be a conscious awareness of pain in order to conclude that the D & X procedure is "cruel," a finding that there is such a conscious awareness of pain on the part of the fetus does appear to be relevant to this Court; so, too, is the inability of the Court to make such a finding. Some might argue that abortion is always cruel because it ends in the death of the fetus; this, however, does not provide a basis for distinguishing between different methods of abortion. If the fetus does not perceive or experience the pain, then it is hard to see how the D & X procedure could be any more cruel than any other abortion method.

This Court recognizes that the subject of when a fetus attains consciousness is a matter of great debate, and that reasonable minds can differ on the issue. As the Supreme Court stated in *Casey:*

Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage. Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision. Our obligation is to define the liberty of all, not to mandate our own moral code.

505 U.S. at 850, 112 S.Ct. at 2806. Until medical science advances to a point at which the determination of when a fetus becomes "conscious" can be made within a reasonable degree of certainty, neither doctors nor judges nor legislators can definitively state when an abortion procedure becomes "cruel," in the sense of when the fetus becomes aware of pain. That judgment must be made by each individual member of society.

Given that there is no reliable evidence that the D & X procedure is more cruel than other methods of abortion, this Court is unable to conclude that the ban on the use of the D & X procedure serves the stated interest of preventing unnecessary cruelty to the fetus.[30] As in *Danforth,* the ban on the D &

---

**29.** The parties stipulated that at the beginning of the D & X procedure, some fetuses are dead, and some are alive. An exact definition of the term "alive" was neither stipulated, nor clarified by the evidence. Indeed, in some basic, elemental sense, the fetus is "alive" from the moment of conception. What is clear, however, is that "alive" does not mean "viable." Were alive to mean viable, the stipulation arguably would be transformed into an acknowledgment that the D & X procedure is more cruel than either the D & E procedure, or any other form of mid-second trimester pregnancy terminations.

Assuming *arguendo* that the fetus does feel pain, one factor which suggests that the D & E procedure might be *more* painful than the D & X procedure—the physical act of dismembering the fetus in the D & E, as opposed to a relatively quick incision and suctioning process in the D & X—is balanced by the younger age of the fetus during the D & E procedure, which is performed earlier in the second trimester, when the nervous system is not as fully developed.

Assuming that the D & X procedure is "cruel," however, this Court fails to see how it is more cruel than the D & E procedure—which involves the dismemberment of the fetus and, sometimes, the crushing of its skull—or how it is always cruel, given that the fetus may already be dead (see Defendant's Exhibit R). The State's banning of the D & X procedure thus raises a question of

whether its purpose in so doing was to prevent unnecessary cruelty, as stated, or, rather, was to place a significant obstacle in the path of a woman seeking a pre-viability abortion in the mid-second trimester. *Casey,* 505 U.S. at 876–77, 112 S.Ct. at 2820. *Cf. Danforth,* 428 U.S. at 78, 96 S.Ct. at 2845 (discussing "the anomaly inherent in [the ban on saline amniocentisis] when it proscribes the use of saline but does not prohibit techniques that are many times more likely to result in maternal death").

**30.** Before *Casey,* the State would have had to show that the ban on the D & X procedure was necessary to achieve a compelling state interest, under a strict scrutiny standard. After *Casey,* the State need only show that it has a legitimate interest, and that the challenged regulation "cannot be said [to] serve no purpose other than to make abortions more difficult." 505 U.S. at 901, 112 S.Ct. at 2833. This new approach appears to require courts to examine whether the challenged regulation serves the stated, legitimate purpose. *See, e.g., Barnes v. Mississippi,* 992 F.2d 1335, 1340 (5th Cir.) (holding that because the challenged two-parent consent statute helped to safeguard the interests of both parents and the family, it could not be said to serve no purpose other than to make abortions more difficult), *cert. denied,* —— U.S. ——, 114 S.Ct. 468, 126 L.Ed.2d

X procedure therefore "comes into focus, instead, as an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting," second-trimester abortions prior to viability. 428 U.S. at 79, 96 S.Ct. at 2845.

This conclusion does not, however, mean that the state cannot regulate the D & X procedure, short of an absolute ban. As discussed above, Plaintiff has demonstrated a substantial likelihood of success of showing that the ban on the D & X procedure is unconstitutional, because it imposes an undue burden on the right to seek a pre-viability abortion, and because the definition of D & X is vague. Assuming, however, that the fetus is conscious of the pain involved in the D & X procedure, it appears to this Court that the state could still seek to vindicate its asserted interest in preventing arguably unnecessary cruelty to the fetus, by regulating the procedure without banning it outright.

Although the testimony on this issue was not conclusive, one such possible regulation may require the physician to cut the umbilical cord prior to making an incision in the base of the skull, and to wait until the fetus dies as a result. Another possible regulation might require the use of local or general anesthetic, on the fetus or the mother. By use of such regulations, states could prevent arguably unnecessary cruelty in the abortion procedure, without taking away the right to seek a pre-viability abortion. In enacting any regulation on the D & X procedure, however, states must bear in mind that they cannot reduce either the safety or the availability of the procedure. Such an effect would render the regulation unconstitutional under both *Danforth* and *Casey*.

## D. The Ban on Post–Viability Abortions

### 1. Description of the Statute

Because the challenged ban on post-viability abortions is particularly complex, it is advisable to provide a detailed overview of all of the provisions before proceeding to analyze them individually.

House Bill 135 bans the performance of all post-viability abortions, unless:

> (1) the physician determines, in good faith and in the exercise of reasonable medical judgment, that the abortion is necessary to prevent the death of the pregnant woman or [medically necessary to prevent] a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman, [or]
>
> (2) the physician determines, in good faith and in the exercise of reasonable medical judgment, after making a determination relative to the viability of the unborn human in conformity with [§ 2919.18(A)], that the unborn human is not viable.

O.R.C. § 2919.17(A)(1–2). The statute defines a serious risk of the substantial and irreversible impairment of a major bodily function as follows:

> [A]ny medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function, including, but not limited to, the following conditions: (1) pre-eclampsia; (2) inevitable abortion; (3) prematurely ruptured membrane; (4) diabetes; (5) multiple sclerosis.

O.R.C. § 2919.16(J). This definition appears to limit the legality of post-viability abortions to situations where an abortion is required to preserve the woman's *physical* health, as opposed to her emotional or psychological health.

If the first exception applies (the abortion is medically necessary), the physician must conform with a number of requirements governing the performance of the abortion, unless a medical emergency exists. The statute sets forth five specific conditions which must be satisfied:

> (a) the physician who performs ... the abortion certifies in writing that that physician has determined, in good faith and in the exercise of reasonable medical judgment, that the abortion is necessary to

419 (1993). Accordingly, this Court must examine whether the ban on the D & X procedure

serves the purpose of preventing unnecessary cruelty to the fetus.

prevent the death of the pregnant woman or a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman.

(b) the determination of [that] physician . . . is concurred in by at least one other physician who certifies in writing that the concurring physician has determined, in good faith, in the exercise of reasonable medical judgment, and following a review of the available medical records of and any available tests pertaining to the pregnant woman, that the abortion is necessary to prevent the death of the pregnant woman or a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman.

(c) the abortion is performed . . . in a health care facility that has or has access to appropriate neonatal services for premature infants.

(d) the physician . . . terminate[s] the pregnancy in the manner that provides the best opportunity for the unborn human to survive, unless that physician determines, in good faith and in the exercise of reasonable medical judgment, that the termination of the pregnancy in that manner poses a significantly greater risk of the death of the pregnant woman or a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman than would other available methods of abortion.

(e) the physician . . . has arranged for the attendance in the same room in which the abortion is to be performed . . . of at least one other physician who is to take control of, provide immediate medical care for, and take all reasonable steps necessary to preserve the life and health of the unborn human immediately upon the unborn human's complete expulsion or extraction from the pregnant woman.

O.R.C. § 2919.17(B)(1)(a–e). These requirements may be summarized as follows: (1) the certification requirement, (2) the second physician concurrence requirement, (3) the neonatal facility requirement, (4) the choice of method requirement, and (5) the second physician attendance requirement.

In the event of a medical emergency, some or all of these requirements may be waived. The statute defines a medical emergency as:

[A] condition that a pregnant woman's physician determines, in good faith and in the exercise of reasonable medical judgment, so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create.

O.R.C. § 2919.16(F). If a medical emergency exists, and is such that the physician cannot comply with one or more of the conditions, the physician may perform the abortion without fulfilling those statutory requirements.

The statute also creates a rebuttable presumption of viability at twenty-four weeks of gestational age. O.R.C. § 2919.17(C). The statute defines gestational age as:

[T]he age of an unborn human as calculated from the first day of the last menstrual period of a pregnant woman.

O.R.C. § 2919.16(B).

A person who violates any of the above provisions is guilty of the crime of terminating a human pregnancy after viability, a fourth-degree felony. O.R.C. § 2919.17(D). In addition, that person may be civilly liable for compensatory and punitive damages. O.R.C. § 2307.52(B).

Plaintiffs have challenged seven separate provisions of this ban: (1) the determination of non-viability, (2) the definition of serious risk of the substantial and irreversible impairment of a major bodily function, (3) the definition of medical emergency, (4) the second physician concurrence requirement, (5) the choice of method requirement, (6) the second physician attendance requirement, and (7) the presumption of viability, including the statutory definition of gestational age. This Court will consider each of these challenges separately.

## 2. Determination of Non-viability

██ As noted, one exception to the ban on post-viability abortions allows a performance of a late-term abortion if the fetus is determined not to be viable. House Bill 135 defines viable as:

[T]he stage of development of a human fetus at which in the determination of a physician, *based on the particular facts of a woman's pregnancy that are known to the physician and in light of medical technology and information reasonably available to the physician,* there is a realistic possibility of the maintaining and nourishing of a life outside of the womb with or without temporary artificial life-sustaining support.

O.R.C. § 2919.16(L) (emphasis added). This definition appears to allow the physician to rely on his own best clinical judgment in determining whether a fetus is viable.

██ The statute directs, however, that the physician cannot perform a late-term abortion unless the fetus is non-viable, as determined in the following manner:

[T]he physician determines, *in good faith and in the exercise of reasonable medical judgment,* that the unborn human is not viable, and the physician makes that determination after performing a medical examination of the pregnant woman and after performing or causing the performing of gestational age, weight, lung maturity, or other tests of the unborn human that a reasonable physician making a determina-

tion as to whether an unborn human is or is not viable would perform or cause to be performed.

O.R.C. § 2919.18(A)(1) (emphasis added). Under this provision, it appears that the physician *cannot* rely solely on his or her own best clinical judgment in determining whether a fetus is viable; instead, that determination must be objectively reasonable as well, that is, reasonable to other physicians, as well as to the physician making the determination.[31]

Plaintiff argues that because one provision (the definition of "viable") suggests that a viability determination may be made based on a physician's own best clinical judgment, whereas another provision (the determination of non-viability) requires that determination to be reasonable to other physicians as well, the statute is unclear as to what standard will be applied, and, thus, is unconstitutionally vague. This Court agrees that the quoted provisions of the statute set forth different standards for judging the legality of the physician's determination, and, thus, that Plaintiff has demonstrated a substantial likelihood of success of showing that the determination of non-viability, as required to satisfy one exception to the post-viability ban, at O.R.C. § 2919.17(A)(2), is unconstitutionally vague, because it fails to provide the physician with fair warning of what legal standard will be applied, and, therefore, of what conduct will incur criminal and civil liability.[32]

**31.** The Court draws this conclusion for two reasons. First, if the term "in the exercise of reasonable medical judgment" were a subjective standard, referring to the physician's own judgment, there would be no need to also require the physician to act "in good faith." It is a maxim of statutory construction that no word or words should be construed in such a way that they are surplusage.

Second, the term "reasonable," as it is used in the law generally, almost always incorporates an objective standard. The term "reasonable belief," for example, is commonly used to indicate *both* that the actor himself holds a belief, *and* that a reasonable man would hold that belief under the same circumstances. *Black's Law Dictionary* 874 (6th ed. 1991). The term "reasonable care" means "that degree of care which a person of ordinary prudence would exercise in the same or similar circumstances." *Id.* at 875. The term "reasonable cause" refers to the "basis

for arrest without warrant, [with] such state of facts as would lead a man of ordinary care and prudence to believe . . . that the person sought to be arrested is guilty of committing a crime." *Id.* These examples, which are not exhaustive, demonstrate that the term "reasonable" generally indicates a requirement that the action be reasonable *to others.* Absent a clear statutory intent to the contrary, this Court must construe the term "in the exercise of reasonable medical judgment" as incorporating an objective standard.

**32.** Standing alone, the statute's definition of viable would appear to be unobjectionable, because it contains a purely subjective standard. In contrast, it could be argued that the determination of viability is void, either because its lack of a scienter requirement creates vagueness, or because the objective reasonableness standard will chill the physician's determination of non-viability, and create an undue burden. For this reason,

### 3. Definition of "Serious Risk of Substantial and Irreversible Impairment of a Major Bodily Function"

█ The other exception to the post-viability ban requires a determination that the abortion is necessary to avert the death of the pregnant woman, or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function. The statute defines the term "serious risk of the substantial and irreversible impairment of a major bodily function" as follows:

> [A]ny medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function, including, but not limited to, the following conditions: (1) pre-eclampsia; (2) inevitable abortion; (3) prematurely ruptured membrane; (4) diabetes; (5) multiple sclerosis.

O.R.C. § 2919.16(J). This definition appears to limit the legality of post-viability abortions to situations where an abortion is required to preserve the woman's *physical* health.

Plaintiff argues that this definition is too narrow, and does not allow the physician to consider other factors which relate to the woman's health, including psychological and emotional factors. Plaintiff cites to a Supreme Court abortion case decided before abortion was legalized in *Roe v. Wade,* which discussed a statute that outlawed abortions except where a doctor determined that the abortion was necessary to preserve the mother's life or health:

> We agree ... that the medical judgment may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs

to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman.

*Doe v. Bolton,* 410 U.S. 179, 192, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973). Plaintiff argues that House Bill 135 impermissibly limits the physician's discretion to determine whether an abortion is necessary to preserve the woman's health, because it limits the physician's consideration to medical factors relating to physical health.[33]

Defendant, however, cites to the Supreme Court's more recent decision in *Casey,* which upheld a similar definition of serious risk of the substantial and irreversible impairment of a major bodily function, that also limited the physician's determination to consideration of medical factors. 505 U.S. at 879–81, 112 S.Ct. at 2822. Defendant argues that the Supreme Court's decision in *Casey* governs here.

Plaintiff responds by pointing out that the challenged definition in *Casey* did *not* have the effect of preventing the performance of an abortion, altogether; instead, it merely allowed for an exception to the informed consent requirement, the 24–hour waiting period, and the parental consent provision. Thus, Plaintiff argues, the application of this definition to the challenged ban on post-viability abortions will have a more severe impact than it did in *Casey,* because it will completely prevent, and not merely delay, abortions that may be necessary to preserve the mother's overall health.

The testimony of Jane Doe Number Two is illustrative of how severe this impact may be. This witness testified to the pain and suffering she and her husband experienced when they discovered, during her twenty-second week of pregnancy, that their baby lacked a spine, had malfunctioning kidneys, and a clubbed foot (Tr., 12/6, at 151–53). A neona-

---

this Court holds that the determination of non-viability, but not the definition of viable, is unconstitutional.

**33.** The testimony in this case indicates that physicians do routinely consider non-medical factors that relate to health, when counseling women about having an abortion. Dr. Paula Hillard testified that she "takes into account the circumstances of the pregnancy which may be a result

of rape or incest. So, I take into account the psychological health of the individual." (Tr., 11/8, at 29). Dr. John Doe Number Two testified that he deals with his patients "in a holistic approach, encompassing not only the physical consequences of the patient's particular situation, but encompassing her psychological well-being, both short and long term." (Tr., 12/7, at 22).

tal specialist advised them that after the baby was born, it would be paralyzed, at least from the waist down, would require immediate kidney dialysis, would need major surgery within thirty minutes of birth, and would probably be hydrocephalic (have water on the brain) (*Id.* at 154). Before this discovery, the witness testified that all indications pointed to an uneventful pregnancy (*Id.* at 155).

Jane Doe Number Two and her husband decided to terminate the pregnancy, rather than carry the baby to term. She explained their decision as follows:

> Just finding out about this, mentally, it just—it crushed both of us. We were excited. We wanted a baby very badly. We had prayed for a girl, and I guess there was guilt involved because maybe we didn't pray for [the baby to be] healthy. And you felt selfish.

> I kept thinking, What did I do? You know, I didn't smoke. I didn't drink. I was eating right. This has to be one of our fault's. It has to be somebody's fault in some way that we're going through this....

> I couldn't imagine mentally going to term. When I found this out, it was on a Friday, and I had my [abortion] procedure scheduled for Tuesday; and just, during that time, all we did was cry, we beat ourselves up about what could we have done differently, when there was nothing we could have done.

> I just—if I had to carry that baby to term, I am not sure I would have chosen to have children again.

*Id.* at 155–56. Jane Doe Number Two terminated her pregnancy by use of the D & X procedure, which was performed by Dr. Haskell. She testified that it was important to her that the fetus be intact, in order have an autopsy performed, and thereby to determine whether a genetic defect had caused the fetal anomalies (*Id.* at 158). The autopsy results indicated that the defect was not genetic. She and her husband have since had twin girls.

Under House Bill 135, it seems probable that a physician would have been forced to determine that Jane Doe Number Two's fetus had a realistic possibility of living after birth with life-sustaining support, although its prognosis was dismal. Therefore, if this Act had been in effect, Jane Doe Number Two would have been forced to carry her baby to term, because there was no threat to her physical health, even though it seems clear that this would have been very damaging to her mental and emotional health.

It is also possible that a pregnant woman who is faced with such a law, and who is carrying a fetus with severe anomalies, might feel forced to abort her pregnancy before her twenty-fourth week of pregnancy merely in order to avoid the ban, even if she would prefer to try some measure, such as fetal surgery, to mitigate or cure the anomaly.

This possibility is suggested by the testimony of another of Dr. Haskell's patients, Jane Doe Number One, who terminated her most recent pregnancy on November 30, 1995. She first learned that there was a problem in her sixteenth week of pregnancy, when it was discovered that her baby had a bladder obstruction and could not urinate (Tr., 12/5, at 16–17). Once it was determined that the kidneys were functioning and that the baby was making good urine, this witness traveled to Detroit and underwent surgery to alleviate the bladder obstruction, in her eighteenth week (*Id.* at 17–18). That surgery was successful; however, the baby's ureter did not function properly, and the baby's right kidney failed as a consequence (*Id.*).

In her twentieth week of pregnancy, Jane Doe Number One traveled back to Detroit, and learned that her baby suffered from "prune belly syndrome." (*Id.* at 19). After reading about the syndrome and consulting with their physician, the witness and her husband learned that their baby only had a twenty percent chance of survival at birth, that he would need a kidney transplant, and that he would probably die before the age of two (*Id.* at 19–20).

Jane Doe Number One was now in her twenty-second week of pregnancy. She and her husband consulted with their own doctor and a pediatric urologist, and then decided to terminate the pregnancy. She explained why they decided to have an abortion:

Because the prognosis was so poor. We had seen that the left kidney had already become involved, and the left ureter was dilated. So, we felt certain that that kidney was going to fail, and we felt that the baby was not going to survive.... It's terribly agonizing to have a baby growing inside of you and to feel him kick and to know that he won't live. It's terrible.

*Id.* at 21. During her twenty-fourth week of pregnancy, Jane Doe Number One received an abortion by use of the D & X procedure, which was performed by Dr. Haskell. She compared her experience with the D & X procedure to a previous abortion by use of an induction procedure, by which she terminated another pregnancy with severe fetal anomalies:

Physically ... there is no comparison. There was minimal pain. I was alert the entire time, and the procedure took, I would say, about an hour to an hour and a half. Physically, the [D & X] procedure is much—it's terrible to say it was easier or better, but the procedure was much easier to endure.

*Id.* at 22–23. She testified that it was definitely helpful to have the D & X procedure available to her (*Id.* at 24).

In addition, Jane Doe Number One expressed concern that House Bill 135 would have forced her to make a decision to terminate the baby before she had the opportunity to do everything possible to save it:

In our situation, the kidneys were involved, and ... the baby's kidneys don't function until week sixteen or eighteen. So, therefore, we would not have known, or couldn't know, that there was a problem and totally tried to help the baby and make him a viable baby prior to that time. We'd have lost the opportunity.... We wouldn't have had a choice, or as many choices.

*Id.* Because her physical health would not have been threatened by carrying the baby to term, Jane Doe Number One would not, under House Bill 135, have been permitted to terminate her pregnancy after her baby was deemed to be viable.

The testimony of these two witnesses demonstrates the problems with House Bill 135's narrow definition of "serious risk of the substantial and irreversible impairment of a major bodily function," and its limitation to strictly medical factors. First, as in the case of Jane Doe Number Two, this definition will force women to carry babies to term which are likely to die before birth or immediately thereafter, or which have a prognosis so poor that its parents feel it would be best to terminate the pregnancy. This result could have a severe, negative impact on the mental and emotional health of the pregnant woman, as well as on the mental and emotional health of the baby's father. Second, as in the case of Jane Doe Number One, the possibility of being required to carry a severely deformed fetus to term might prompt pregnant women who are carrying fetuses with severe anomalies to abort before their twenty-fourth week, simply in order to avoid the ban, even if they would prefer first to attempt some measures to improve their baby's chances of survival.

Finally, although there was no direct testimony from a victim of rape or incest, Dr. Hillard did testify about an eleven-year-old victim of incest, whose pregnancy was not diagnosed until approximately her twenty-second week, at which time legal charges were brought against her father (Tr., 11/8, at 52). The girl and her mother then requested that the pregnancy be terminated, and Dr. Hillard performed the procedure. Under House Bill 135, Dr. Hillard would have had to perform viability testing before terminating the pregnancy; if the fetus had been adjudged to be viable, and there were no physical threat to the girl's health, she would have been forced to carry her pregnancy to term. In this Court's view, it is inconceivable that the act of being forced to bear her father's child, could have failed to have a severe, negative, and lasting impact on this girl's emotional and psychological health.

The issue of whether a state may ban postviability abortions except where necessary to preserve the woman's *physical* health, even if carrying the baby to term would cause her to suffer severe mental or emotional harm, appears to be an issue of first impression before this, or any, Court.

■ Under the authority of *Doe v. Bolton,* discussed above, this Court holds that a

state may not constitutionally limit the provision of abortions only to those situations in which a pregnant woman's physical health is threatened, because this impermissibly limits the physician's discretion to determine what measures are necessary to preserve her health.[34] *Casey* is not dispositive of this issue, because it only considered restrictions which delayed, but did not prevent, pre-viability abortions; whereas, in this case, the statute will completely prevent the performance of post-viability abortions that may, in appropriate medical judgment, be necessary to preserve the health of the pregnant woman. Under *Casey,* such a regulation is clearly unconstitutional. 505 U.S. at 877–79, 112 S.Ct. at 2821. Accordingly, Plaintiff has demonstrated a substantial likelihood of success of showing that the Act's definition of "serious risk of the substantial and irreversible impairment of a major bodily function," which is limited to strictly medical factors in application to the ban on post-viability abortions, is unconstitutional.[35]

### 4. Definition of "Medical Emergency"

In its explanation of its Temporary Restraining Order, granted on November 13, 1995, this Court stated that Plaintiff had demonstrated a substantial likelihood of success of showing that the medical emergency definition was unconstitutional on two grounds: first, it lacked a *mens rea,* or scienter, requirement, and therefore was vague; second, it did not allow physicians to rely solely on their own best clinical judgment in determining that a medical emergency existed, and so would chill physicians from exer-

cising their best medical judgment in deciding whether such an emergency exists.[36] Most of that discussion will be repeated here. In addition, the Court will address the effect of O.R.C. § 2901.21, which could potentially allow this Court to import a scienter requirement of "recklessness" into the medical emergency definition.

Before turning to the Act itself, it is advisable to define the meaning of the terms "scienter" and *"mens rea"*, and to describe their importance in the law. The term "scienter" means "knowingly" and is "frequently used to signify the defendant's guilty knowledge." *Black's Law Dictionary* 1207 (5th ed.1979). The term *"mens rea"* refers to a "guilty mind, a guilty or wrongful purpose, a criminal intent." *Id.* at 889. Both of these terms require that a defendant have some degree of guilty knowledge, or some degree of blameworthiness or culpability, in order to be criminally liable. Statutes which do *not* contain such a requirement, and which impose criminal liability even if the defendant did not knowingly violate the law, or did not have a culpable state of mind, are known as "strict liability" statutes.

There is a strong presumption in our law favoring a *mens rea* or scienter requirement in statutes which create criminal liability. *See Staples v. United States,* —— U.S. ——, ——, 114 S.Ct. 1793, 1797, 128 L.Ed.2d 608 (1994) ("we must construe the statute in light of the background rules of common law ... in which the requirement of some *mens rea* for a crime is firmly embedded"); *United*

---

**34.** In addition, as highlighted by Jane Doe Number One's testimony, an exception which is limited only to preserving the pregnant woman's physical health may run the risk of impermissibly limiting the physician's discretion—and the mother's decision—to take whatever steps may be helpful (surgical or otherwise) in dealing with the specific problems facing that unborn child.

**35.** As discussed in an earlier part of the opinion, this Court concludes that it need not apply the *Salerno* standard to restrictions on post-viability abortions, and that a pregnant woman may therefore succeed in a facial challenge to such a regulation, even if she cannot show that "no set of circumstances exists under which the law would be valid."

**36.** On this point, it is significant that, as far as this Court is aware, no other court has been confronted with a medical emergency definition that includes an objective requirement, and therefore does not permit the physician to rely solely on his or her best clinical judgment.

This objective requirement seems certain to create a chilling effect—particularly given the lack of a scienter requirement. Even if the statute had a scienter requirement, it might still have a chilling effect, though to a lesser extent, given that the physician would still be subject to prosecution if other physicians disagreed with his or her determination. This Court therefore takes no position on whether an objective requirement in a medical emergency definition, with or without a scienter requirement, is also void for vagueness.

*States v. United States Gypsum Co.*, 438 U.S. 422, 437–38, 98 S.Ct. 2864, 2873–74, 57 L.Ed.2d 854 (1978) ("the limited circumstances in which Congress has created and this Court has recognized [strict-liability] offenses ... attest to their generally disfavored status"); *Dennis v. United States*, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137 (1951) ("the existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence"). The rationale for this presumption was eloquently set forth by Justice Jackson:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to"....
>
> The unanimity with which [courts] have adhered to the central thought that wrongdoing must be conscious to be criminal is emphasized by the variety, disparity and confusion of their definitions of the requisite but elusive mental element ... [including] such terms as "felonious intent," "criminal intent," "malice aforethought," "guilty knowledge," "fraudulent intent," "willfulness," "*scienter*," to denote guilty knowledge, or "*mens rea*," to signify an evil purpose or mental culpability. By use or combination of these various tokens, they have sought to protect those who were not blameworthy *in mind* from conviction of infamous common-law crimes.

*Morissette v. United States*, 342 U.S. 246, 250–52, 72 S.Ct. 240, 243–44, 96 L.Ed. 288 (1952) (emphasis added). Although the presumption favoring a *mens rea* requirement is not as strong in statutes creating civil liability, because House Bill 135 imposes civil and criminal liability for the same actions, this Court must analyze the provisions of the Act in light of the presumption of a *mens rea* requirement. Having described the meaning and importance of a "guilty knowledge" requirement in laws creating criminal liability, this Court now turns to House Bill 135.

The medical emergency exception, which is defined in Ohio Revised Code section 2919.16(F), is employed in the ban on post-viability abortions. This Court concludes that because, under the definition of medical emergency, a physician may not rely alone on his own good-faith clinical judgment in determining that a medical emergency exists, and because both the medical emergency definition and provisions imposing criminal liability for violations of section 2919.17 lack scienter requirements, Plaintiff has demonstrated a substantial likelihood of success of showing that the medical emergency definition in the Act is unconstitutional.

House Bill 135 defines a medical emergency as follows:

> "Medical emergency" means a condition that a pregnant woman's physician determines, *in good faith and in the exercise of reasonable medical judgment,* so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create.

O.R.C. § 2919.16(F) (emphasis added). This definition includes subjective and objective requirements: the physician must believe, himself, that the abortion is necessary, *and* his belief must be objectively reasonable to other physicians. Under this definition, a finding that the physician failed to act in good faith is therefore *not necessary* to impose civil and criminal liability. One could act in good faith and according to one's own best medical judgment, and yet incur civil and criminal liability if, after the fact, the exercise of that medical judgment is determined by others to have been not objectively reasonable. In other words, physicians need not act willfully or recklessly in determining that a medical emergency exists in order to incur criminal liability; instead, they face liability even if they act in good faith, and

according to their own best (albeit, in the later opinion of others, mistaken) medical judgment. Thus, this definition appears to create strict liability, that is, liability even if the physician acts in good faith, and without a culpable mental state, to comply with the statute.

Although this Court is unaware of any case which has considered the constitutionality of a similar provision, there are three cases which this Court finds to be relevant. In *Colautti v. Franklin*, 439 U.S. 379, 396, 99 S.Ct. 675, 686, 58 L.Ed.2d 596 (1979), the Supreme Court held unconstitutional a Pennsylvania provision which required physicians to determine non-viability before performing an abortion. If a physician failed to abide by specific requirements where there was "sufficient reason" to believe that the fetus "may be viable," he was civilly and criminally liable. *Id.* at 394, 99 S.Ct. at 685. No language in the statute indicated that liability was to be predicated on a culpable state of mind. *Id.* at 380 n. 1, 99 S.Ct. at 678 n. 1. The determination of non-viability was to be based on the physician's "experience, judgment, or professional competence." *Id.* at 380 n. 1, 99 S.Ct. at 678 n. 1.

In concluding that the provision did not contain a scienter requirement, the Court found that neither Pennsylvania criminal law nor the Act itself "requires that the physician be culpable in failing to find sufficient reason to believe that the fetus may be viable." *Id.* at 394–95, 99 S.Ct. at 685. The Court also noted that the subjective standard in the Act which is "keyed to the physician's individual skills and abilities ... is different from a requirement that the physician be culpable or blameworthy for his performance...." *Id.* at 395 n. 12, 99 S.Ct. at 685 n. 12. The Supreme Court then held the provision void for vagueness due to its lack of a *mens rea* requirement:

This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.* Because of the absence of a scienter requirement in the provision directing the physician to determine whether the fetus is or may be viable, the statute is

little more than a 'trap for those who act in good faith.'

The perils of strict criminal liability are particularly acute here because of the uncertainty of the viability determination itself. As the record in this case indicates, a physician determines whether or not a fetus is viable after considering a number of variables.... In the face of these uncertainties, *it is not unlikely that experts will disagree....* The prospect of such disagreement, in conjunction with a statute imposing strict civil and criminal liability for an erroneous determination of viability, could have a profound chilling effect on the willingness of physicians to perform abortions ... in the manner indicated by their best medical judgment.

*Id.* at 395–96, 99 S.Ct. at 686 (citations omitted) (emphasis added).

*Colautti* is directly applicable to this case, insofar as the determination of whether a medical emergency exists is similarly fraught with uncertainty, and is therefore equally susceptible to being disputed by experts at a later date, thereby resulting in criminal liability even where the physician acted in good faith. As noted, the medical emergency exception in House Bill 135 contains both a subjective and an objective requirement. Because *both* of these requirements must be met in order for the physician to avoid liability, and because there is no scienter requirement in this provision, a physician who performs a post-viability abortion under the medical emergency exception may be held liable *even if* he or she acted in good faith, as long as the physician was later determined, in the eyes of others, using 20/20 hindsight, to have acted unreasonably. Plaintiffs have demonstrated a substantial likelihood of success of showing that, given the short amount of time in which every decision regarding a medical emergency must be made, and given the varying, highly individual factors which must be considered for each case, it is not unlikely that even where a physician acts in good faith, experts may *later* disagree as to the existence, immediacy, or extent of a medical emergency. As in *Colautti*, this prospect of disagreement, combined with the strict civil and criminal liability for even good-faith

1084

determinations, could chill physicians from performing post-viability abortions even where it is their best medical judgment that an abortion is required to preserve the life or health of a patient.

In so finding, this Court acknowledges that the "undue burden" analysis in *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), applies only to pre-viability abortions, and therefore does not apply to this provision governing the performance of post-viability abortions. Although it may seem that this would render any "chilling effect" irrelevant, this is manifestly not the case. In *Casey,* the Supreme Court recognized that the State's interest in the life of the fetus allows it to regulate or proscribe abortions after viability, *except* "where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." 505 U.S. at 879, 112 S.Ct. at 2821. Such is the situation here. If physicians were chilled from acting according to their own best medical judgment when determining whether a post-viability abortion is necessary to save the life of the mother, and were forced to resolve even the smallest doubt in favor of a refusal to act, this could have a profound, negative impact on the State's interest in preserving the life and health of the mother, and on the pregnant woman's interest in her own life and health. It is this Court's belief that such a situation would offend the Constitution to an even *greater* degree than those situations in which a chilling effect precludes the performance of elective pre-viability abortions, which are not necessary to preserve the mother's life or health. Therefore, the analysis in *Colautti* is applicable to this case.

A more recent case which addresses this issue is *Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452 (8th Cir.1995). In that case, the Court invalidated provisions regarding the performance of abortions which created civil and criminal liability for violations of South Dakota's parental-notice, mandatory-information, and medical-emergency requirements. The medical emergency provision in that case did *not* require the physician either to act in good faith, or to apply reasonable medical judgment; instead, it merely provided:

> If a medical emergency compels the performance of an abortion, the physician shall inform the female, prior to the abortion *if possible,* of the medical indications supporting his judgment that an abortion is necessary to avert her death or that delay will create serious risk of substantial and irreversible impairment of a major bodily function.

*Id.* at 1455 n. 4. Other provisions imposed civil and criminal liability for violation of the medical emergency provision:

> [§ 34–23A–22] If an abortion occurs which is not in compliance with [the medical emergency provision], the person upon whom such an abortion has been performed ... may maintain an action against the person who performed the abortion for ten thousand dollars in punitive damages and treble whatever actual damages the plaintiff may have sustained.

> [34–23A–10.2] A physician who violates [the medical emergency provision] is guilty of a Class 2 misdemeanor.

*Id.* at 1455–56 n. 5–6. None of these provisions contained a scienter or *mens rea* requirement on their face.

The District Court found that the provision creating criminal liability lacked a *mens rea* requirement, which "made it unconstitutionally vague, creating a 'chilling effect' so that physicians, who cannot guess the standard under which the courts will judge their conduct, would choose not to act at all." *Id.* at 1463. The District Court also invalidated the civil liability provision on similar grounds, after concluding that strict civil liability created an undue burden because it made it unlikely that any physician would perform abortions. *Id.*

The Eighth Circuit affirmed the lower court's decision, due to the statute's lack of a scienter requirement. It agreed that the provision creating criminal liability would create an undue burden by chilling the willingness of physicians to perform abortions. *Id.* at 1465. It further agreed that the provision creating civil liability—which did not require a finding that the defendant acted

willfully, wantonly, or maliciously, before awarding punitive damages—was invalid:

> The potential civil liability for even good-faith, reasonable mistakes is more than enough to chill the willingness of physicians to perform abortions in South Dakota. We therefore hold that [this provision] is an undue burden on a woman's right to choose whether to terminate her pre-viability pregnancy.

*Id.* at 1467.

As noted, the medical emergency exception in House Bill 135 could impose civil and criminal liability even where the physician acted in good faith. Plaintiffs have demonstrated a substantial likelihood of success of showing that, given the fact that reasonable physicians might disagree as to the existence or immediacy of a medical emergency, this provision would create liability even for good-faith, reasonable mistakes. As in *Miller,* this result would chill the willingness of physicians to perform post-viability abortions even where they are necessary, in a medical emergency, to preserve the life and health of the mother.

A third case which supports this Court's findings is the Eighth Circuit's decision to uphold the North Dakota definition of a medical emergency, because it allowed the physician to rely on his or her own "best clinical judgment" in determining whether an emergency existed, and because the statute contained a scienter requirement. *Fargo Women's Health Org. v. Schafer,* 18 F.3d 526, 534 (8th Cir.1994) ("It is the exercise of clinical judgment that saves the statute from vagueness ... In addition, the North Dakota Act contains a scienter requirement that we believe prevents a finding of vagueness."). *Accord Barnes v. Moore,* 970 F.2d 12, 15 (5th Cir.1992) (upholding medical emergency definition which allowed physician to rely on "best clinical judgment" and contained scienter requirement for imposition of criminal liability). The statute at issue in *Schafer* defined a "medical emergency" as:

> that condition which, on the basis of the physician's *best clinical judgment,* so complicates a pregnancy as to necessitate an immediate abortion to avert the death of the mother or for which a twenty-four hour delay will create grave peril of immediate and irreversible loss of major bodily function.

*Id.* at 527, n. 3 (emphasis added). Although the North Dakota statute did not expressly contain a scienter requirement, North Dakota criminal statutes which neither specify culpability, nor explicitly provide that culpability is not required, are construed as requiring a "willful" violation of the statute, which is further defined as conduct done "intentionally, knowingly, or recklessly." *Id.* at 534–35. Thus, although the statute containing the medical emergency definition was silent on the question of intent, the Eighth Circuit imported a scienter requirement into the statute.

The medical emergency definition in House Bill 135 differs in two significant respects from the definition in *Schafer.* First, the definition in House Bill 135 does *not* allow the physician to rely solely on his or her own best, good-faith medical judgment; instead, in addition to requiring that he or she act in good faith, it requires the physician to apply *"reasonable* medical judgment," which is an objective requirement, subject to second-guessing by other physicians. Second, the medical emergency provision creates strict liability because it lacks a scienter requirement; in addition, the provisions creating criminal liability for violations of the ban on post-viability abortions, and of the viability testing requirement—both of which apply the medical emergency exception—lack scienter requirements. Therefore, the medical emergency exception in House Bill 135 appears to fail both of the tests upon which the North Dakota definition was held to be valid.

In its earlier opinion which explained its Temporary Restraining Order, this Court incorrectly stated that Ohio law does not allow courts to import a scienter requirement into criminal statutes that are silent on the issue of whether intent is a required element, relying on *State v. Curry,* 43 Ohio St.2d 66, 330 N.E.2d 720 (1975) ("If the statute is silent on the question of intent, intent is not an element of the crime."). Plaintiff correctly pointed out that an Ohio law enacted immediately prior to *Curry* (although inapplicable to

the facts in *Curry,* which arose prior to the effective date of the statute) might, however, allow this Court to import a scienter requirement into the medical emergency definition, even though that definition does not include any intent requirement. Section 2901.21(B) of the Ohio Revised Code provides that:

> When the section defining an offense does not specify any degree of culpability, and plainly indicates a purpose to impose strict criminal liability for the conduct described in such section, then culpability is not required for a person to be guilty of the offense. When the section neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense.

Thus, if the statute does not plainly indicate an intent to impose strict liability, Ohio courts could import a scienter requirement of recklessness into the statute.

■ For two reasons, it is this Court's opinion that Ohio courts would decline to import a recklessness standard into the statute's requirement that a physician act "in the exercise of reasonable medical judgment" when determining whether a medical emergency exists.

First, both sections of the statute which apply the medical emergency definition—the ban on post-viability abortions, and the viability testing requirement, discussed *infra*— plainly indicate an intention to impose strict liability. Both of these sections state that "no person shall" perform the proscribed acts, and fail to specify any mental state. Ohio courts have held that similar laws which lack culpable mental states, and contain the term "no person shall ...," plainly indicate an intention to impose strict liability. *State v. Cheraso,* 43 Ohio App.3d 221, 223, 540

N.E.2d 326 (1988); *Village of Bridgeport v. Bowen,* 1995 WL 539605, at *3, 1995 Ohio App. LEXIS 3892, at *6 (Ohio Ct.App.1995). In addition, it is significant that although the post-viability ban and the viability testing requirement lack scienter requirements, the ban on use of the D & X procedure does contain a scienter requirement.[37] Ohio courts have held if portions of a statute specify a culpable mental state, whereas other portions of the statute are silent as to the culpable mental state, this is a plain indication of an intent to impose strict liability in the latter sections or portions. *State v. Wac,* 68 Ohio St.2d 84, 87, 428 N.E.2d 428 (1981); *City of Brecksville v. Marchetti,* 1995 WL 693091, 1995 Ohio App. LEXIS 5164 (Ohio Ct.App.1995). Based on the foregoing, this Court finds that the ban on post-viability abortions, and the viability testing requirement, "plainly indicate" an intention to create strict liability.

Even if this were not the case, however, Ohio courts would be unable to import a recklessness requirement without, in effect, rewriting the statute. This is because the statute's standard of "reasonableness," which imposes criminal liability if a physician acts unreasonably in determining that a medical emergency exists, is a lower standard for incurring criminal liability, from the perspective of the actor, than the standard of "recklessness."[38] If courts were to import a recklessness requirement into the medical emergency definition per the above-quoted section 2901.21(B), physicians would no longer be liable if they acted unreasonably, i.e., negligently; instead, they would have to act recklessly in order to be liable. This would contradict the legislature's intent to create liability if a physician fails to act "in the exercise of reasonable medical judgment," and would amount to rewriting the statute, which courts

---

**37.** O.R.C. § 2919.15(B) provides: "No person shall *knowingly* perform or attempt to perform a Dilation and Extraction procedure upon a pregnant woman." (emphasis added). This demonstrates that the General Assembly knows how to include a scienter requirement when that is its intention.

**38.** The difference between the two standards is most easily discernible in the area of tort law. As an example, a physician who commits medical malpractice may be found guilty of negli-

gence if he acts unreasonably. If he acts recklessly, however, he may be found guilty of gross negligence, which is a more serious offense, and exposes the physician to a greater degree of liability. *See, e.g., Gearhart v. Angeloff,* 17 Ohio App.2d 143, 244 N.E.2d 802 (1969) ("Punitive damages may be recovered in an action for negligence where such negligence is so gross as to show a reckless indifference to the rights and safety of other persons.") (quoting syllabus).

may not do. Therefore, this Court concludes that a scienter requirement may *not* be imported into the definition of medical emergency.

On the basis of the foregoing, this Court concludes that the Plaintiffs have shown a substantial likelihood of demonstrating that the medical emergency exception in O.R.C. § 2919.16(F) is unconstitutional on two grounds: first, it appears to be vague, because both the definition of medical emergency, and the provisions imposing criminal (and civil) liability for violations of the post-viability ban and the viability testing requirement, lack scienter requirements; second, the requirement that a physician's determination be objectively reasonable—that is, reasonable to other physicians—would appear to create a chilling effect that would prevent physicians from performing post-viability abortions where, in their own best judgment, an abortion is necessary to preserve the life or health of the mother.

### 5. Second Physician Concurrence Requirement

 If it is determined that a post-viability abortion is necessary to save the life of the mother, or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the mother, the physician who performs the abortion must comply with a number of conditions governing the performance of the abortion. One of these provisions requires that at least one other doctor concur, in writing, as to the necessity of the abortion:

> The determination of the physician who performs ... the abortion ... is concurred in by at least one other physician who certifies in writing that the concurring physician has determined, in good faith, in the exercise of reasonable medical judgment, and following a review of the available medical records of and any available tests [sic] results pertaining to the preg-

nant woman, that the abortion is necessary to prevent the death of the pregnant woman or a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman.

O.R.C. § 2919.17(B)(1)(b). Plaintiff argues that this requirement is unconstitutional because it undermines the physician's judgment, imposes unnecessary and cumbersome delays, and will be difficult to satisfy because few physicians will be willing to concur, in writing, to an abortion's necessity.[39]

In *Doe v. Bolton,* the Supreme Court struck down a Georgia statute which required a physician to obtain confirmation of his decision to perform an abortion, from two other doctors. The Court reasoned that this requirement interfered with the physician's clinical judgment and discretion:

> The statute's emphasis ... is on the attending physician's 'best clinical judgment that an abortion is necessary.' That should be sufficient. The reasons for the presence of the confirmation step in the statute are perhaps apparent, but they are insufficient to withstand constitutional challenge.... If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies. Required acquiescence by co-practitioners has no rational connection with a patient's needs and unduly infringes on the physician's right to practice.

410 U.S. at 199, 93 S.Ct. at 751. This holding by the Supreme Court appears to govern the analysis of the concurrence requirement in this case, and Defendants have made no argument as to why it should not so apply. Accordingly, this Court finds that Plaintiff has demonstrated a substantial likelihood of success of showing that the second physician concurrence requirement in House Bill 135 is

---

**39.** The testimony by doctors who perform late-term abortions indicates that this may be a valid concern. Dr. John Doe Number One testified that it would be "virtually impossible" to find a second physician who would be willing to certify in writing that an abortion is necessary: "No one wants to involve themselves in the issue. I think

... whether it would be fear of personal harm, whether it would be fear of being ostracized, fear of picketing, who would want to involve themselves in this issue. It would be much easier to ignore it rather than to have your name on that chart." (Tr., 12/5, at 51).

unconstitutional, because it impermissibly interferes with the physician's discretion.

Additionally, it appears to this Court that this requirement may be unconstitutional for the same reasons which render the medical emergency definition likely to be unconstitutional; to wit, the requirement that a second physician concur "in good faith [and] in the exercise of reasonable medical judgment" imposes criminal and civil liability on such concurring physicians who act according to their own best clinical judgment, without any criminal intent. This is likely to create a chilling effect which will deter physicians from concurring, in writing, that an abortion is medically necessary; this will chill the performance of abortions which are necessary to preserve the life or health of the mother. Accordingly, this Court finds that Plaintiff has demonstrated a substantial likelihood of success of showing that the second physician concurrence requirement in House Bill 135 is unconstitutional, because it is likely to chill the performance of post-viability abortions which are necessary to preserve the life or health of the mother.

### 6. Choice of Method Requirement

■ Under House Bill 135, another condition which must be satisfied by a doctor performing a post-viability abortion is the so-called "choice of method" requirement:

> The physician who performs ... the abortion terminates ... the pregnancy in the manner that provides the best opportunity for the unborn human to survive, unless that physician determines, in good faith and in the exercise of reasonable medical judgment, that the termination of the pregnancy in that manner poses a *significantly greater risk* of the death of the pregnant woman or a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman than would other available methods of abortion.

O.R.C. § 2919.17(B)(1)(d) (emphasis added). Plaintiff argues that the requirement that a particular method of abortion be used unless it would pose a *significantly* greater risk of harm to the woman, is unconstitutional, because it requires the physician to "trade off" the woman's health for that of the fetus.

In *Colautti v. Franklin*, 439 U.S. 379, 400, 99 S.Ct. 675, 688, 58 L.Ed.2d 596 (1979) the Supreme Court held that a statute which "requires the physician to make a 'trade-off' between the woman's health and additional percentage points of fetal survival" posed serious ethical and constitutional difficulties.

Later, in *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 769, 106 S.Ct. 2169, 2183, 90 L.Ed.2d 779 (1986), the Supreme Court invalidated a "choice of method" provision which was remarkably similar to the challenged provision in House Bill 135, reasoning that the words "significantly greater medical risk" required the woman to bear an additional, increased risk to her health, and so was unconstitutional. The provision at issue in *Thornburgh* read:

> Every person who performs or induces an abortion after an unborn child has been determined to be viable shall exercise that degree of professional skill, care and diligence ... and the abortion technique employed shall be that which would provide the best opportunity for the unborn child to be aborted alive unless, in the good faith judgment of the physician, that method or technique would present a *significantly greater medical risk* to the life or health of the pregnant woman.... Any person who intentionally, knowingly, or recklessly violates that provisions of this subsection commits a felony of the third degree.

476 U.S. at 768 n. 13, 106 S.Ct. at 2182 n. 13 (emphasis added). The only differences between this statute and the one at issue in the present case are: first, that the provision in *Thornburgh* allowed the physician to rely solely on his best clinical judgment, whereas the provision in House Bill 135 does not; second, that the statute in *Thornburgh* required a culpable mental state in order to impose criminal liability, whereas House Bill 135 does not require any criminal intent. The *Thornburgh* provision therefore seems far *less* egregious than that in House Bill 135, which, because it does not allow the physician to rely solely on his or her best clinical judgment, and imposes criminal liabil-

ity even if there were no criminal intent, seems likely to have a chilling effect on the physician's exercise of discretion in determining which abortion method may be used without causing a "significantly" greater risk to the woman's health. This chilling effect would negatively impact the woman's life and health. Accordingly, this Court finds that Plaintiff has demonstrated a substantial likelihood of success of showing that the choice of method provision in House Bill 135 is unconstitutional, because it will impermissibly interfere with the physician's exercise of discretion, to the detriment of the pregnant woman's health.

Given the similarity between the provision in *Thornburgh* and the challenged provision in this case, this Court further finds that Plaintiff has demonstrated a substantial likelihood of success of showing that the choice of method requirement is unconstitutional, because it "trades off" the health of the mother for that of the fetus, and requires her to bear an increased medical risk.

### 7. Second Physician Attendance Requirement

 Another requirement in House Bill 135 pertaining to the provision of post-viability abortions requires that a second physician be present when the abortion is performed, to care for the fetus:

> The physician who performs ... the abortion has arranged for the attendance in the same room in which the abortion is to be performed ... of at least one other physician who is to take control of, provide immediate medical care for, and take all reasonable steps necessary to preserve the life and health of the unborn human immediately upon the unborn human's complete expulsion or extraction from the pregnant woman.

O.R.C. § 2919.17(B)(1)(e). Plaintiff also challenges the constitutionality of this provision.

The Supreme Court has considered similar provisions in two cases. In *Planned Parent-*

*hood Ass'n of Kansas City v. Ashcroft,* 462 U.S. 476, 485–86, 103 S.Ct. 2517, 2522, 76 L.Ed.2d 733 (1983), the Supreme Court upheld a second physician attendance requirement because it served the state's compelling interest in preserving the life of the fetus. Although there was no clear medical emergency exception in that statute, the Court construed the requirement as allowing for an exception in medical emergencies. 462 U.S. at 485 n. 8, 103 S.Ct. at 2522 n. 8. In *Thornburgh,* however, the Court struck down a second physician attendance requirement, because it did not contain a *valid* medical emergency exception. 476 U.S. at 771, 106 S.Ct. at 2184. Therefore, the constitutionality of the second physician attendance requirement in House Bill 135 appears to depend upon the validity of the statute's medical emergency exception.

As discussed above, this Court has found that Plaintiff has demonstrated a substantial likelihood of success of showing that the medical emergency exception in House Bill 135 is unconstitutional, because it lacks a scienter requirement, and is thus vague, and because its objective reasonableness standard will chill physicians from determining that a medical emergency exists. For that reason, this Court finds that Plaintiff has also demonstrated a substantial likelihood of success of showing that the second physician attendance requirement in House Bill 135 is unconstitutional.[40]

### 8. Rebuttable Presumption of Viability

 For purposes of the ban on post-viability abortions, House Bill 135 creates a rebuttable presumption "that an unborn child of at least twenty-four weeks of gestational age is viable." O.R.C. § 2919.17(C). The statute defines gestational age as "the age of an unborn human as calculated from the first day of the last menstrual period of a pregnant woman." O.R.C. § 2919.16(B).

Plaintiff challenges this requirement on three grounds. First, Plaintiff argues that a rebuttable presumption of viability impermis-

---

**40.** In this Court's opinion, the chilling argument which applied to the second physician concurrence requirement would *not* apply to this requirement, which does not require the second physician to give a written endorsement of the abortion, and merely requires him or her to perform the arguably laudable role of caring for the fetus.

sibly limits the physician's discretion to determine viability. Second, Plaintiff argues that because the last menstrual period (LMP) method of calculating gestational age generally produces an age that is two weeks earlier than the age from conception, the presumption actually attaches at twenty-two weeks, when fetuses are not viable, and so is necessarily invalid. Finally, Plaintiff argues that because the presumption can only be rebutted after the physician is arrested and prosecuted, it will chill physicians from determining that fetuses of a gestational age of twenty-four or more weeks are not viable, and will constitute an undue burden on the right to seek a pre-viability abortion.

This Court declines to consider the likelihood of success of any of these arguments. Although the Supreme Court's decision in *Webster v. Reproductive Health Services*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), indicates that it may be constitutionally permissible for a state to impose a rebuttable presumption of viability,[41] this Court finds it unnecessary to reach this issue at this time, because, as was discussed *supra*, Plaintiff has demonstrated a substantial likelihood of success of showing that the determination of non-viability in House Bill 135 is unconstitutionally vague, as the objective standard in that determination conflicts with the purely subjective standard in the statute's definition of viable in O.R.C. § 2919.16(L). If this Court determines, after a hearing on the merits, that the determination of non-viability is unconstitutional, then any portion of the statute which requires a physician to either determine viability, or rebut a presumption of viability, must, likewise, be invalidated. Accordingly, the Court finds it unnecessary to reach any of Plaintiff's arguments, in order to find that Plaintiff has demonstrated a substantial likelihood of success of showing that the rebuttable presumption of viability is unconstitutional,

for the reason that the statute's mandated determination of non-viability is invalid.

### E. Viability Testing Requirement

■ The third major portion of House Bill 135 creates a viability testing requirement at the twenty-second week of pregnancy, which must be complied with before an abortion after that time may be performed:

Except as provided in [the medical emergency exception], no physician shall perform ... an abortion upon a pregnant woman after the beginning of her twenty-second week of pregnancy unless, prior to the performance [of] ... the abortion, the physician determines, in good faith and in the exercise of reasonable medical judgment, that the unborn human is not viable, and the physician makes that determination after performing a medical examination of the pregnant woman and after performing or causing the performing of gestational age, weight, lung maturity, or other tests of the unborn human that a reasonable physician making a determination as to whether an unborn human is or is not viable would perform or cause to be performed.

O.R.C. § 2919.18(A)(1). In addition to performing these tests, the physician may not perform the abortion "without first entering the determination ... and the associated findings of the medical examination and tests described ... in the medical records of the pregnant woman." § 2919.18(A)(2). The physician need not comply with either of these requirements if a medical emergency exists. § 2919.18(A)(3). Violation of this section of the Act is a fourth degree misdemeanor. § 2919.18(B).

Although a viability testing requirement was upheld in *Webster*, 492 U.S. at 490, 109 S.Ct. at 3041, the viability testing requirement in House Bill 135 appears to be unconstitutional for two reasons. First, for the

---

41. In *Webster*, a five-member majority of the Supreme Court upheld a viability testing requirement that attached at the twentieth week of pregnancy. Although the challenged statute also imposed "what is essentially a presumption of viability at 20 weeks," *id.* at 515, 109 S.Ct. at 3055, Justice O'Connor pointed out in her concurring opinion that the constitutionality of that pre-

sumption was not an issue before the Court. *Id.* at 526, 109 S.Ct. at 3061. Justice O'Connor did state, however, that, in her opinion, an argument that this presumption of viability impermissibly restricted the judgment of the physician would probably be unsuccessful. *Id.* at 527, 109 S.Ct. at 3061.

reasons given in an earlier part of this opinion, the statute's determination of non-viability appears to be unconstitutionally vague. Second, for the reasons also given in an earlier part of this opinion, the definition of medical emergency appears to lack a *mens rea* requirement, which creates vagueness, and also appears likely to create a chilling effect that would unconstitutionally jeopardize the life or health of pregnant women needing an abortion, due to its requirement that a physician's determination that a medical emergency exists be objectively reasonable.

Accordingly, Plaintiff has demonstrated a substantial likelihood of success of showing that the challenged viability testing requirement is unconstitutional, for two reasons. First, it lacks a valid medical emergency exception. Second, the definition of viable in O.R.C. § 2919.16(L), which applies to this viability testing requirement,[42] allows the physician to rely solely on his or her own best clinical judgment, whereas this mandated determination of non-viability also imposes a requirement that the physician's determination be *objectively* reasonable; this conflict creates an ambiguity which appears to render this portion of the Act unconstitutionally vague, because the physician has no clear guidance as to what standard will be applied in judging whether he or she is criminally and civilly liable.

### III. Whether Issuance of an Injunction Will Save Plaintiff from Irreparable Injury

■ Having considered the substantial likelihood of Plaintiff's success on the merits, this Court now turns to the remaining prongs governing the issuance of a preliminary injunction. The second prong of the preliminary injunction standard requires the Court to make findings as to whether the issuance of an injunction is necessary to save the plaintiff from irreparable injury.

Importantly, Plaintiff Haskell has standing in this lawsuit not only to raise his own rights, but also to raise the rights of his patients. Therefore, this Court need not decide whether the harm which Plaintiff Haskell will suffer if prosecuted criminally or sued civilly under the Act, is irreparable. Instead, this Court will focus on the harm which will be suffered by his patients.

Both Jane Doe Number One and Jane Doe Number Two testified that they chose to terminate their pregnancies, late in the second trimester, after discovering that their unborn children had severe anomalies. If this Act had been in effect, either or both of these women may have been prevented from terminating their pregnancies, under either the provisions of the viability testing requirement, or the provisions of the post-viability ban. In both cases, the fetus may well have been determined to have been viable, and would not have been able to be aborted.

In this Court's opinion, the cost of being forced by the state to carry to term a child without a spine, or functioning kidneys, or with other such severe defects, is beyond description. It is difficult to imagine how horrible it would be to knowingly carry a child to term who is dying, or who has no reasonable chance of normal physical development.[43]

In addition, it is impossible to calculate the harm which would be suffered by a pregnant woman who, though she would prefer to try surgery or other methods to mitigate her unborn child's severe defects, is compelled by this ban on post-viability abortions—which only allows an abortion if her *physical* health is in danger—to terminate her pregnancy before the ban can apply to her, instead of

---

**42.** The definitions in O.R.C. § 2919.16 apply both to the post-viability ban in § 2919.17, and to the viability testing requirement in § 2919.18. If the definition is flawed, then a regulation or requirement based on that definition is also flawed.

**43.** Although it may seem that a child who was certain to die, and had no reasonable chance for normal development, would not be considered to be viable, the testimony in this case indicates otherwise. Dr. Harlan Giles, for example, testified that babies with certain chromosomal defects are considered to be viable "even though these children have no reasonable chance for normal mental motor development.... even though it's a very serious defect, [and] even though it usually leads to death in the nursery." (Tr., 11/13, at 286).

taking measures to help her unborn child, because she feared the emotional and mental cost of carrying a child to term who had such severe defects. It is difficult to imagine a clearer example of irreparable harm, than is evidenced by these two scenarios.

As for the harm suffered by pregnant women who are unable to terminate their pregnancies by means of the D & X procedure, Jane Doe Number Two testified that the procedure was helpful to her because it allowed her fetus to be aborted intact, which was necessary for the performance of an autopsy. After learning that the defect was not genetic, she and her husband had more children. Jane Doe Number One testified that the D & X procedure was much easier to endure than an earlier abortion performed by use of an induction procedure. In addition, this Court has held that Plaintiff has demonstrated a substantial likelihood of success of showing that the alternatives to the D & X procedure—induction methods, hysterotomies, and hysterectomies—are neither as safe to the mother's health, nor as available to women seeking non-therapeutic abortions. Pregnant women in this state who are unable to terminate their pregnancies by means of the D & X procedure may therefore suffer irreparable harm, either because other abortion methods are not as safe for their health, or because other abortion methods are not as available to them.

Based on the above, this Court concludes that a preliminary injunction would serve to prevent irreparable injury to the patients of Plaintiff Haskell.

### IV. Whether Issuance of an Injunction Would Harm Others

 The third prong of the preliminary injunction standard traditionally requires this Court to "balance the equities" in considering whether the harm to the Defendant resulting from issuing the injunction, would outweigh the harm to the Plaintiff resulting from denying the injunction.

As far as the Defendants' interests are concerned, a preliminary injunction will merely maintain the status quo while the constitutionality of this legislation is decided. The potential for irreparable injury to some of Plaintiff's patients has already been discussed; in addition, other pregnant women may be harmed by specific provisions of the Act. For example, the objective reasonableness standard in the medical emergency definition may chill the discretion of a pregnant woman's physician in determining that a medical emergency exists, to the detriment of her health. As another example, the apparent vagueness of the determination of non-viability may chill physicians from determining that certain fetuses are not viable, and, therefore, may place an undue burden in the path of a woman seeking a pre-viability abortion. In this Court's opinion, therefore, the harm to the patients whom Plaintiff represents, should the preliminary injunction be denied, would be greater than the harm to the Defendants, if the injunction were granted.

### V. Whether Issuance of an Injunction Would Serve the Public Interest

 The final prong of the preliminary injunction standard requires this Court to determine whether the issuance of an injunction would serve the public interest.

In this Court's opinion, the public interest is best served by a full and fair hearing on the merits of the constitutionality of this legislation, particularly in view of the fact that the Plaintiff has demonstrated a substantial likelihood of success of showing that numerous provisions in House Bill 135 are unconstitutional. Accordingly, the Court concludes that the public interest would be served by the issuance of a preliminary injunction.

### VI. Conclusion/Conclusions of Law

To summarize, this Court has held that all four prongs of the preliminary injunction standard weigh in favor of granting a preliminary injunction, which enjoins enforcement of all provisions of House Bill 135. In addition, this Court has held:

(1) it has federal question jurisdiction, under 28 U.S.C. § 1331, over this constitutional challenge to a state statute;

(2) Plaintiff Haskell may seek pre-enforcement review of House Bill 135, and this lawsuit is therefore ripe;

(3) Plaintiff Haskell has standing to bring this action, and may assert both his own rights and the rights of his patients;

(4) the *Salerno* standard no longer applies to a facial challenge to pre-viability abortion regulations;

(5) the *Salerno* standard does not apply to a facial challenge to post-viability abortion regulations;

(6) although a state may proscribe most abortions subsequent to viability, the state may not take away a pregnant woman's right to have a post-viability abortion where, in appropriate medical judgment, such an abortion is necessary to preserve her life or health—accordingly, strict scrutiny should not be utilized in this analysis;

(7) Plaintiff has demonstrated a substantial likelihood of success of showing that the definition of "Dilation and Extraction procedure" in O.R.C. § 2919.15(A) is unconstitutional, because of vagueness;

(8) Plaintiff has demonstrated a substantial likelihood of success of showing that the ban on use of the D & X procedure in § 2919.15(B) is unconstitutional, because the state may not ban an abortion procedure unless there are safe and available alternatives, and because this ban may chill the exercise of a woman's right to a pre-viability abortion;

(9) Plaintiff has demonstrated a substantial likelihood of success of showing that the ban on use of the D & X procedure does not serve the stated interest of preventing unnecessary cruelty to the fetus;

(10) Plaintiff has demonstrated a substantial likelihood of success of showing that the mandated determination of non-viability in § 2919.18(A)(1), as applied to the post-viability ban (§ 2919.17(A)(2)) and the viability testing requirement (§ 2919.18), is unconstitutional, because the objective standard in that determination is inconsistent with the purely subjective standard in the definition of viable in § 2919.16(L);

(11) Plaintiff has demonstrated a substantial likelihood of success of showing that the

definition of serious risk of the substantial and irreversible impairment of a major bodily function in § 2919.16(J), as it applies to one allowable exception to the ban on post viability abortions, in § 2919.17(A)(1), is unconstitutional, because its limitation to factors relating solely to physical health impermissibly restricts the physician's determination of whether an abortion is necessary to preserve the health of the pregnant woman;

(12) Plaintiff has demonstrated a substantial likelihood of success of showing that the definition of medical emergency in § 2919.16(F), as it applies to the post-viability ban (§ 2919.17) and the viability testing requirement (§ 2919.18), is unconstitutional, because it lacks a scienter requirement, and thus is vague, and because it does not allow the physician to rely on his or her own best clinical judgment that a medical emergency exists, and so may chill physicians from determining that a medical emergency exists even where necessary to preserve the pregnant woman's life or health;

(13) Plaintiff has demonstrated a substantial likelihood of success of showing that the second physician concurrence requirement in § 2919.17(B)(1)(b) is unconstitutional, because it impermissibly limits the primary physician's discretion, and because it may chill the performance of post-viability abortions that are necessary to preserve the life or health of the mother;

(14) Plaintiff has demonstrated a substantial likelihood of success of showing that the choice of method requirement in § 2919.17(B)(1)(d) is unconstitutional, because it requires the woman to bear an increased medical risk, forces the physician to "trade off" the pregnant woman's health for that of the fetus, and impermissibly interferes with the physician's exercise of discretion, to the detriment of the pregnant woman's health;

(15) Plaintiff has demonstrated a substantial likelihood of success of showing that the second physician attendance requirement in § 2919.17(B)(1)(e) is unconstitutional, because the medical emergency exception appears to be unconstitutional;

(16) Plaintiff has demonstrated a substantial likelihood of success of showing that the

rebuttable presumption of viability in § 2919.17(C) is unconstitutional, because the mandated determination of non-viability in House Bill 135 appears to be unconstitutional;

(17) Plaintiff has demonstrated a substantial likelihood of success of showing that the viability testing requirement in § 2919.18(A)(1) is unconstitutional, because the medical emergency definition appears to be unconstitutional, and because the mandated determination of non-viability appears to be unconstitutional.

This Court further concludes that the issuance of an injunction will prevent irreparable injury to the patients of Plaintiff Haskell, that such injury outweighs the injury which will be suffered by Defendants if this injunction is issued, and that the public interest would be served by the issuance of this preliminary injunction.[44]

WHEREFORE, based upon the aforesaid, this Court orders that the Plaintiff's Motion for a Preliminary Injunction be GRANTED, effective as of the filing of this opinion. Accordingly, Defendants, their employees, agents, and servants are preliminarily enjoined from enforcing any provision of House Bill 135. Having considered the issue of bond as is required by Rule 65 of the Federal Rules of Civil Procedure, this Court concludes that no bond should be required of the Plaintiff.

Counsel listed below will note that a brief telephone conference will be held, between Court and Counsel, beginning at 4:00 p.m., Eastern time, on Friday, December 22, 1995, for the express purpose of determining further procedures to be followed in this litigation. Specifically, Counsel should be prepared to discuss whether they wish to proceed to trial upon the merits of the captioned cause, at a date in mid–1996, or whether, in the alternative, Defendants wish to take an immediate appeal of this decision to the Sixth Circuit Court of Appeals, pursuant to 28 U.S.C. § 1292(a)(1).

---

**44.** This Court adopts the findings set forth within this Opinion as its Findings of Fact, for purposes of Rule 52(a) of the Federal Rules of Civil Procedure. This Court finds support for its lack of separate findings of fact in the Supreme Court's holding "that there must be findings, stated either in the court's opinion or separately, which are sufficient to indicate the factual basis for the ultimate conclusion." *Kelley v. Everglades Drainage Dist.,* 319 U.S. 415, 422, 63 S.Ct. 1141, 1145, 87 L.Ed. 1485 (1943), *quoted with approval in B.F. Goodrich Co. v. Rubber Latex Prod., Inc.,* 400 F.2d 401, 402 (6th Cir.1968); *see also Slanco v. United Counties,* 711 F.2d 1059 (6th Cir.1983) (allowing district court to adopt oral opinion as findings of fact and conclusions of law for purposes of Rule 52); *Craggett v. Bd. of Educ. of Cleveland City Sch. Dist.,* 338 F.2d 941 (6th Cir. 1964) (allowing district court to adopt written memorandum as findings of fact and conclusions of law for purposes of Rule 52).

However, this Court assures Counsel for the Plaintiff and the state Defendants that their detailed, proposed Findings of Fact and Conclusions of Law were thoroughly reviewed and form the basis of much of the discussion contained herein. This includes the submissions of the state Defendants which were not fully delivered to this Court's chambers, by facsimile, until 3:45 a.m., this date. In short, the diligent efforts of Counsel have not been in vain.

For purposes of completing the record, this Court also renders the following evidentiary rulings: Plaintiff's Exhibit 24 is admitted, for the limited purpose of showing the position of the American College of Obstetricians and Gynecologists on the federal Partial Birth Abortion Act of 1995, but not for the truth of the statements asserted therein. Plaintiff's Exhibit 25 is excluded, as hearsay.